## CARITATIVO *v.* CALIFORNIA ET AL.

No. 561.   Argued May 21, 1958.—
Decided June 30, 1958.*

*George T. Davis* argued the cause and filed a brief for petitioner in No. 561.

*A. J. Zirpoli* argued the cause and filed a brief for petitioner in No. 562.

*Clarence A. Linn,* Assistant Attorney General of California, argued the cause for respondents in No. 561, and *Arlo E. Smith,* Deputy Attorney General of California, argued the cause for respondent in No. 562.   With them on the briefs was *Edmund G. Brown,* Attorney General.

*Together with No. 562, *Rupp* v. *Dickson, Acting Warden,* also on certiorari to the same Court.

Per Curiam.

The judgments are affirmed. *Solesbee* v. *Balkcom,* 339 U. S. 9, 12.

Mr. Justice Harlan, concurring.

Being uncertain as to the full implications of *Solesbee* v. *Balkcom,* 339 U. S. 9, I prefer not to rely on that decision in disposing of these cases.

I proceed on the premise that the Fourteenth Amendment prohibits a State from executing a prisoner who has become insane after his conviction. Even so, I do not believe that the procedure established by California to deal with such cases, in evident recognition of the grave interest at stake, can upon the records before us be said to offend due process.

The California statute in substance imposes on the warden a mandatory duty to make a continuing check on the mental condition of condemned prisoners and to notify the district attorney whenever he finds grounds for belief that a prisoner has become insane. Upon being so advised, it is the unqualified duty of the district attorney to submit the issue of the prisoner's sanity to a jury in judicial proceedings in which the prisoner is entitled to be heard. The prisoner is given no right to commence such proceedings himself, or to be heard in connection with the warden's initiating determination. Affidavits submitted by the warden disclose that his statutory duty is carried out under a regular procedure pursuant to which the prison psychiatric staff submits reports to the warden as to all condemned prisoners soon after their arrival at the prison, and also submits a special psychiatric report within 20 days of a scheduled execution.

This procedure, in my opinion, satisfies the test of fundamental fairness which underlies due process. At the post-conviction stage of a capital case, it seems to me

entirely proper for the State to condition a prisoner's right to a sanity trial upon a preliminary determination by a responsible official that "good reason" exists for the belief that the prisoner has become insane. Surely it is not inappropriate for California to lodge this grave responsibility in the hands of the warden, the official who beyond all others has had the most intimate relations with, and best opportunity to observe, the prisoner. And having regard to the natural and impelling impulse of lawyers representing condemned men to stave off their execution as long as possible, I also think it constitutionally permissible for the State to conclude that such a preliminary determination should be made *ex parte*. It is a legitimate consideration for California to take into account that an adversary proceeding on the issue of probable cause might open the door to interminable delaying maneuvers in capital cases, contrary to the sound administration of justice. For example, unless this Court were prepared to accept as conclusive the warden's representation that he had reckoned with the condemned prisoner's submissions, whenever such a representation is challenged, it would inevitably invite judicial proceedings to determine whether the warden had in fact acted properly on every occasion that a condemned man claimed that he had become insane.

Granting that under the Fourteenth Amendment the warden may not refrain from making a responsible and good-faith determination, no considerations of this kind are suggested by either of the records before us. The warden's affidavits show that the usual procedures were followed here; that the prison psychiatrists unanimously concluded that each of the petitioners was sane; that the warden personally observed their conduct; and that "neither from the psychiatric reports, his own observation, nor the reports of his custodial staff has he any reason to believe [petitioners] presently insane." In

addition, the warden affirms his intention to institute the required proceedings to determine petitioners' sanity if and when he has "good reason" to believe either of them insane. Petitioners do not controvert the substance of these affirmations, but simply claim that they were denied due process because the warden acted without according them an opportunity to be heard or to submit further data.

In the absence of any challenge to the warden's affirmations that he followed the customary California procedure, that is, that he determined petitioners' sanity on the basis of responsible medical advice and on his own personal observations, and in the absence of any allegation that he acted in bad faith, I cannot say that the petitioners were denied due process solely because the warden declined, in the exercise of his discretion, to consider also the professions sought to be made on their behalf.

For these reasons I concur in the Court's affirmance of the two judgments.

MR. JUSTICE FRANKFURTER, whom MR. JUSTICE DOUGLAS and MR. JUSTICE BRENNAN join, dissenting.

By its summary disposition of these cases, the Court extends the disturbing decision in Solesbee v. Balkcom, 339 U. S. 9, where it was found that a State did not offend due process by leaving to the private judgment of its governor, in which the victim had no part, the determination of the sanity of a man condemned to death. Now it appears that this determination, upon which depends the fearful question of life or death, may also be made on the mere say-so of the warden of a state prison, according to such procedure as he chooses to pursue, and more particularly without any right on the part of a man awaiting death who claims that insanity has supervened to have his case put to the warden. There can hardly be a comparable situation under our constitutional scheme of things in which an interest so great, that an insane man

not be executed, is given such flimsy procedural protection, and where one asserting a claim is denied the rudimentary right of having his side submitted to the one who sits in judgment.

Petitioners in both these cases have been convicted of murder in the first degree and sentenced to death. Their convictions were affirmed by the Supreme Court of California. *People* v. *Caritativo,* 46 Cal. 2d 68, 292 P. 2d 513; *People* v. *Rupp,* 41 Cal. 2d 371, 260 P. 2d 1. Subsequently, each petitioned that court for habeas corpus to review the determination of the warden of San Quentin, where they are confined awaiting execution, that there is no reason to believe petitioners insane and his refusal to institute proceedings under California law to determine their present sanity. To review the denial of these petitions, *Caritativo* v. *Teets,* 48 A. C. (Minutes, May 8, 1957); *Rupp* v. *Teets,* 49 A. C. (Minutes, Aug. 27, 1957), we granted certiorari. 355 U. S. 853, 854.

Sections 3700 and 3701 of the California Penal Code set forth the procedure to be followed in determining the sanity of a person condemned to death. Section 3700 provides that, "No judge, court, or officer, other than the Governor, can suspend the execution of a judgment of death, except the warden of the State prison to whom he is delivered for execution, as provided in the six succeeding sections, unless an appeal is taken." Section 3701 provides that, "If, after his delivery to the warden for execution, there is good reason to believe that a defendant, under judgment of death, has become insane, the warden must call such fact to the attention of the district attorney of the county in which the prison is situated, whose duty it is to immediately file in the superior court of such county a petition, stating the conviction and judgment, and the fact that the defendant is believed to be insane, and asking that the question of his sanity be inquired into. Thereupon the court must at once cause to be

summoned and impaneled, from the regular jury list of the county, a jury of 12 persons to hear such inquiry."

The warden in the present cases did not institute proceedings pursuant to these sections leading to a judicial determination of petitioners' sanity. According to the petitions for habeas corpus filed in the California Supreme Court, he did not do so in spite of the fact that "there is good reason to believe" that petitioners are insane. Affidavits of the warden, appended to briefs filed in this Court, state that he has observed the petitioners and examined reports submitted to him by prison psychiatrists, and that he has no reason to believe that petitioners are insane. Furthermore, that he "intends to follow the statutes of California and to institute proceedings to determine [petitioners'] . . . sanity pursuant to section 3701 of the Penal Code, if and when he has 'good reason to believe' [they are] . . . insane."

In Rupp's petition for habeas corpus, it is stated that the conclusions of the prison psychiatrists, upon which the warden professed to rely in reaching his determination that there was no reason to think Rupp insane, were made without benefit of the complete medical and psychiatric reports relating to Rupp's past history of mental disease. This history is set forth in detail in the petition and shows a continuous record of mental disease extending over many years. It is also stated that the warden has refused to allow a private psychiatrist, employed by Rupp's sister, to examine the prisoner to determine his sanity, and has refused to let Rupp's attorneys examine the prison psychiatric records. In regard to Caritativo, it is clear from the warden's affidavit that he refused counsel permission to have the prisoner examined by a private psychiatrist, and declared that he would "rely on the advice of the members of his staff as to the mental condition of Bart Luis Caritativo."

It is now perfectly clear, as it was not when the Court decided *Phyle* v. *Duffy,* 334 U. S. 431, that there is no remedy whatsoever under California law if the warden fails to perform the duties imposed upon him by § 3701. Neither habeas corpus nor mandamus is available to review his determination that there is no reason to believe a condemned man insane. His determination on this issue is not a "preliminary determination," but both an initial and final determination. The fate of the condemned man rests entirely with the warden, and depends on his willingness to consider the prisoner's sanity, and, if he decides to consider this question, his willingness to hear and rationally appraise information relevant to such a determination. Beyond the warden, under California law, there is no recourse of right. Even if no reasonable man would say that the condemned prisoner is sane, still, if the warden does not choose to call this fact to the attention of the district attorney, the insane prisoner will be executed. Thus, even if constitutional requirements are met by the procedure set forth in the California statute, under which the warden may determine the question of sanity without any opportunity for the condemned man to put his case, there is no way under California law to inquire into whether the warden has in fact followed this rudimentary procedure and made any inquiry whatsoever into the prisoner's sanity. The only assurance that he has done so in the present cases comes from the warden's own affidavits, two of which were introduced for the first time with respondents' briefs filed in this Court.

Under the California statute, what information the warden considers, and the manner in which he considers it, in the common experience of lawyers a factor vital in determining the outcome of any legal inquiry, are matters resting solely with the warden. He may make his determination *ex parte,* and, as evidently was true in the

present cases, without affording the condemned man, his counsel, or family, any opportunity whatsoever to present evidence or arguments highly relevant to the proper disposition of the case and therefore essential to be considered, from a rational point of view, if the warden is properly to perform the duty imposed upon him by law. In these cases the warden relied almost exclusively on the reports of his staff and refused to allow examination of petitioners by independent psychiatrists. If the petition for habeas corpus filed on behalf of Rupp is to be believed, and for our purposes it must be believed for it was not traversed, he was denied the opportunity to put before the warden much information on his medical history that would be highly pertinent to any inquiry into his present sanity, and, at the least, was highly relevant to a fair judgment whether further inquiry should be pursued.

In considering the adequacy of this procedure, it is important to bear in mind that California does not tolerate the execution of the insane. California Penal Code, § 1367. On the contrary, from the beginning of its history as a State, California has explicitly forbidden it. Cal. Stat. 1850, c. 119, § 615. The State has adhered to a view set deep in the Common Law and part and parcel of our notions of what is tolerable in a civilized society. The reasons for this view, explaining and justifying the profound abhorrence with which the execution of the insane has long been regarded, I have set forth in my dissent in *Solesbee* v. *Balkcom,* 339 U. S. 9, 14. Time has not discredited or weakened the force of these reasons. It is not merely a matter of administrative grace, to be dispensed at the will of the warden, that an insane man not be executed. It is a matter of right under both California law and the Federal Constitution. So important does California consider the matter that, in § 3701 of the Penal Code, it has provided for a judicial proceeding and jury determination of the question of sanity once the warden

has notified the district attorney. So, substantially, it has been from the beginning in California. Cal. Stat. 1850, c. 119, § 502. I make no claim that the Due Process Clause requires an opportunity to persons in the place of petitioners to have their claim tested in a judicial proceeding. I do not even suggest that there must be a formal adversary hearing before the warden. I do insist on the mandatory requirement that some procedure be established for assuring that the warden give ear to a claim that the circumstances warrant his submission of the issue of sanity to a determination in accordance with the procedure set forth in the California statutes.

Surely the right of an insane man not to be executed, a right based on moral principles deeply embedded in the traditions and feelings of our people and itself protected by the Due Process Clause of the Fourteenth Amendment, merits the procedural protection that that Amendment safeguards. What kind of a constitutional right is it, especially if life is at stake, the vindication of which rests wholly in the hands of an administrative official whose actions cannot be inquired into, and who need not consider the claims of the person most vitally affected, the person in whom the constitutional right is said to inhere? In *Solesbee* v. *Balkcom, supra,* the Court found that a State had not offended due process in constituting its governor an "apt and special tribunal" for determining, in *ex parte* proceedings, the sanity of a condemned man at the time of execution. The Court relied particularly on "the solemn responsibility of a state's highest executive." 339 U. S., at 13. It analogized the function given the governor to the power to pardon and reprieve, powers traditionally confided to the chief executive of the State. It did not appear in that case whether, in exercising this function, the governor had declined to hear statements on the defendant's behalf. In the present case, however, the determination is not to be made on the

"solemn responsibility of a state's highest executive," but by a prison warden. There is no apparent reason why this awesome power, surely without parallel under our law in the freedom of its exercise and the seriousness of its consequences, should not after today's decision be entrusted to still lower administrative officials. It is no reflection on the qualities of wardens and similar officials to point out that when wielded by them in *ex parte* proceedings this power can scarcely be assimilated to the chief executive's traditional power to pardon or reprieve. Finally, in these cases, it does appear that the warden did in fact refuse to consider evidence tendered on the prisoners' behalf, and refused to allow an examination by independent psychiatrists. He expressly rested his determination on the untested conclusions of his own staff.

*Audi alteram partem*—hear the other side!—a demand made insistently through the centuries, is now a command, spoken with the voice of the Due Process Clause of the Fourteenth Amendment, against state governments, and every branch of them—executive, legislative, and judicial—whenever any individual, however lowly and unfortunate, asserts a legal claim. It is beside the point that the claim may turn out not to be meritorious. It is beside the point that delay in the enforcement of the law may be entailed. The protection of a constitutional right to life ought not be subordinated to the fear that some lawyers will be wanting in the observance of their professional responsibilities. The right to be heard somehow by someone before a claim is denied, particularly if life hangs in the balance, is far greater in importance to society, in the light of the sad history of its denial, than inconvenience in the execution of the law. If this is true when mere property interests are at stake, see *Walker* v. *City of Hutchinson*, 352 U. S. 112; *Covey* v. *Town of Somers*, 351 U. S. 141; *Mullane* v. *Central Hanover Bank*

& *Trust Co.*, 339 U. S. 306, how much more so when the difference is between life and death. As Mr. Justice Holmes said, happily speaking for the Court, in *United States* v. *Oppenheimer,* 242 U. S. 85, 87, "It cannot be that the safeguards of the person, so often and so rightly mentioned with solemn reverence, are less than those that protect from a liability in debt."

It may well be that if the warden of a California prison cannot act on his arbitrary judgment—for it is inherently arbitrary if the condemned man or those who speak for him are not allowed to be heard—in deciding whether there is good reason to believe that a person about to be executed is insane, that unworthy claims will be put to the warden and perchance add to delays in the execution of the law. But far better such minor inconveniences, and an effective penal administration ought to find no difficulty in making them minor, than that the State of California should have on its conscience a single execution that would be barbaric because the victim was in fact, though he had no opportunity to show it, mentally unfit to meet his destiny.