United States v. Savage Truck Line, supra at 447 of 209 F.2d.

Reversed and remanded for further proceedings consistent with this opinion.

Willie JONES, Appellant,

v.

UNITED STATES of America, Appellee.

No. 17485.

United States Court of Appeals District of Columbia Circuit.

Argued May 10, 1963.

Decided Dec. 13, 1963.

---

Mr. James J. Laughlin, Washington, D. C., for appellant. Mr. Albert J.

Ahern, Jr., Washington, D. C., also entered an appearance for appellant.

Mr. Barry Sidman, Asst. U. S. Atty., with whom Messrs. David C. Acheson, U. S. Atty., and Frank Q. Nebeker and Joseph A. Lowther, Asst. U. S. Attys., were on the brief, for appellee.

Before BAZELON, Chief Judge, and WILBUR K. MILLER, FAHY, WASHINGTON, DANAHER, BASTIAN, BURGER, WRIGHT and McGOWAN, Circuit Judges, sitting en banc.

DANAHER, Circuit Judge, with whom WILBUR K. MILLER, WASHINGTON, BASTIAN, BURGER and McGOWAN, Circuit Judges, join:

A jury on April 25, 1959 found Jones guilty of assault with intent to kill one Alma Jordan, and of murder in the first degree in that he had shot to death one Reginald L. Winters as the latter sat at the woman's bedside in a local hospital. On appeal, this court, *sua sponte*, ordered [1] hearing *en banc*. We unanimously affirmed appellant's conviction of assault with intent to kill Alma Jordan, but the first degree conviction was affirmed by decision of a divided court on October 5, 1961.[2] The Supreme Court denied certiorari, June 4, 1962.[3] Meanwhile Congress had adopted new legislation[4] dealing with the punishment of murder. Our present question is: what bearing has the 1962 Act as to punishment of murder in the first degree upon this appellant's sentence, imposed in 1959?

## I

Pursuant to the command of the statute[5] the District Judge on October 9, 1959 had pronounced the sentence of death by electrocution to be carried out on January 8, 1960. He incorporated into the judgment a further provision which reads:

"provided, however, that if an appeal from this judgment be taken to the United States Court of Appeals for the District of Columbia Circuit, the sentence of death shall be stayed until the mandate of said Court of Appeals, or, if certiorari shall have been granted, until the mandate of the United States Supreme Court shall have been issued to this Court, and the Court shall have fixed a new date of execution."

Such were the terms of the judgment which this court affirmed and which the Supreme Court refused to review. The appellant had been convicted. He had been sentenced as required by the statute, and the litigation on the merits had finally been terminated. Nothing remained to be done but to enforce by execution what had been determined.[6]

It is clear beyond peradventure that this court had and has no control over a sentence which comports with the applicable statute,[7] "even though it

[1]. We were quite aware that the case presented various important questions. Relevant also was our realization that the law as it then read provided that the "punishment of murder in the first degree *shall be* death by electrocution." (Emphasis supplied.) D.C.Code § 22–2404 (1951).

[2]. Jones v. United States, 111 U.S.App.D.C. 276, 296 F.2d 398 (1961). The "defendant" had asked to be found not guilty by reason of insanity. Our joint view read:
"It is argued to us that the evidence respecting the mental condition of the accused required a directed verdict of not guilty by reason of insanity. Without relating the testimony we deem it sufficient to say we are of opinion that

a question for the jury was presented." 111 U.S.App.D.C. at 282, 296 F.2d at 404.

[3]. 370 U.S. 913, 82 S.Ct. 1260, 8 L.Ed.2d 406.

[4]. P.L. 87–423, approved March 22, 1962, 76 Stat. 46, D.C.Code § 22–2404 (Supp. II, 1961).

[5]. *Supra* note 1.

[6]. Berman v. United States, 302 U.S. 211, 212, 213, 58 S.Ct. 164, 82 L.Ed. 204 (1937).

[7]. United States v. Rosenberg, 195 F.2d 583, 604, 607 (2 Cir.), cert. denied, 344 U.S. 838, 73 S.Ct. 20, 97 L.Ed. 652 [and see 344 U.S. 850, 889, 73 S.Ct. 66, 134, 97 L.Ed. 661, 687 (1952)]; cf. Gore v.

be a death sentence." [8] Nor may we reduce or modify a sentence nor require a trial judge to do so.[9]

## II

Such was the state of the law known to Congress when Public Law 87–423 [10] was adopted. No new crime was created for the legislation dealt only with punishment. The Act, effective March 22, 1962, provided that thenceforward the punishment of murder in the first degree shall be death by electrocution unless the jury by unanimous vote shall recommend life imprisonment. Should the court be informed that the jury after determining guilt is unable to agree as to punishment, the judge is authorized "to impose and shall impose either a sentence of death by electrocution or life imprisonment." [11] Such provisions, obviously prospective in operation, did not apply to sentences imposed prior to March 22, 1962, for the amendatory Act contained no language applying its ameliorating provisions to previously committed offenses.[12]

Thus Congress was specific on the point that final judgments were not vacated for the Act provided:

"Cases tried prior to the effective date of this Act and which are before the court for the purpose of sentence or resentence *shall be governed by the provisions of law in effect prior to the effective date of this Act: Provided,* That the judge may, in his sole discretion, consider circumstances in mitigation and in aggravation and make a determination as to whether the case in his opinion justifies a sentence of life imprisonment, in which event he shall sentence the defendant to life imprisonment. Such a sentence of life imprisonment shall be in accordance with the provisions of this Act." (Emphasis supplied.) [13]

Quite apart from the language of the 1962 Act but nonetheless apt is that portion of Title I, U.S.Code § 109 [14] which provides that the

"repeal of any statute shall not have *the effect to release or extinguish* any penalty, forfeiture, or liability incurred under such statute, unless the repealing Act shall so expressly provide, and such statute shall be treated as still remaining in force for the purpose of sustaining any proper action or prosecution for the enforcement of such penalty, forfeiture, or liability." [15]

United States, 357 U.S. 386, 393, 78 S. Ct. 1280, 2 L.Ed.2d 1405 (1958).

8. Rosenberg v. United States, 346 U.S. 273, 278, 73 S.Ct. 1152, 1162, 97 L.Ed. 1607 (1953), quoting from separate memorandum of Frankfurter, J., 344 U.S. 889, 890, 73 S.Ct. 134, 97 L.Ed. 687 (1952).

9. Bryson v. United States, 265 F.2d 9, 14 (9 Cir.), cert. denied, 360 U.S. 919, 79 S.Ct. 1437, 3 L.Ed.2d 1535 (1959). Where the prescribed sentence is not mandatory, "facts and circumstances before the trial court" may properly influence the extent of punishment. Blockburger v. United States, 284 U.S. 299, 305, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932).

10. See note 4 *supra.*

11. *Ibid.* In yet other respects not here pertinent, the amendatory Act effectually repealed D.C.Code § 22–2401 (Supp. II, 1961). United States v. Tynen, 11 Wall.

88, 92, 78 U.S. 88, 92, 20 L.Ed. 153 (1871).

12. Lovely v. United States, 175 F.2d 312, 317 (4 Cir. 1949); Duffel v. United States, 95 U.S.App.D.C. 242, 221 F.2d 523 (1954); Hurwitz v. United States, 60 App.D.C. 298, 53 F.2d 552 (1931); Maceo v. United States, 46 F.2d 788, 789 (5 Cir. 1931).

13. The purpose of the proviso was to make it possible for the court to deal with a special class of cases. United States v. McElvain, 272 U.S. 633, 638–639, 47 S. Ct. 219, 71 L.Ed. 451 (1926); United States v. Ewing, 140 U.S. 142, 148, 11 S.Ct. 743, 35 L.Ed. 388 (1891); cf. Husty v. United States, 282 U.S. 694, 702–703, 51 S.Ct. 240, 75 L.Ed. 629 (1931).

14. Act of July 30, 1947, 61 Stat. 633, codifying Title I.

15. This language derived from Rev.Stat. § 13, 58 Stat. 118, 1 U.S.Code § 29 (1946). And see cases cited in note 12 *supra.*

■ The conclusion is inescapable that the death sentence not only was mandatory, final and unreviewable, but that sentence had not been vacated by the amendatory Act. There remained to the appellant only the possibility of relief to be accorded pursuant to the proviso. The judge was authorized "in his sole discretion" [16] to take two steps: to (1) *consider circumstances* in mitigation and in aggravation and [2] *make a determination* as to whether the case in his opinion justifies a sentence of life imprisonment * * *." (Emphasis supplied.) Should he decide that life imprisonment was appropriate he was to resentence the appellant "in accordance with the provisions of this Act." [17]

### III

■ After the Supreme Court on June 6, 1962 had denied appellant's petition for a writ of certiorari, this court's mandate was reissued to the District Court on June 11, 1962. Thereupon, appellant through counsel filed a timely "Motion to Reduce or Modify Sentence" [18] seeking a hearing that he might "offer testimony in mitigation of the offense" to the end that the death sentence might be reduced to one of life imprisonment.

The text of the motion particularized that "a request will be made" that the District Court

"authorize and direct a commitment to St. Elizabeths Hospital for an extended period *to determine the mental capacity of the defendant at this time.* At ·the trial there was considerable evidence introduced as to the defendant's mental capacity at the time of the offense. We are confident that a full examination at this time by the staff at St. Elizabeths Hospital will result in a finding of unsoundness of mind *at the present time.* This, of course, would make impossible the infliction of the penalty already imposed by the court." (Emphasis supplied.) [19]

The motion for reduction of sentence came on for hearing on October 5, 1962. Defense attorney Ahern, the record shows, earnestly pressed upon the notice of the judge certain evidence as to the appellant's lack of sanity, the history of his earlier commitment by unanimous order of the Mental Health Commission and like references. He argued that "mitigation" as used in the Act was intended to permit the judge to review the

16. In Strather v. United States, 13 App. D.C. 132 (1898), the trial judge instructed the jury that life imprisonment might not be recommended unless the jury found that mitigating circumstances would seem to require that result. Winston v. United States, 13 App.D.C. 157 (1898) was controlled by this Strather opinion. Reversing in Winston v. United States, 172 U.S. 303, 313, 19 S.Ct. 212, 215, 43 L.Ed. 456 (1899), the Supreme Court pointed out that the Act "does not itself prescribe, nor authorize the court to prescribe, any rule defining or circumscribing the exercise of this right; but commits the whole matter of its exercise to the judgment and the consciences of the jury. The authority of the jury to decide that the accused shall not be punished capitally is not limited to cases in which the court, or the jury, is of opinion that there are palliating or mitigating circumstances." And see Andres v. United States, 333 U.S. 740, 743 n. 4, 68 S.Ct. 880, 92 L.Ed. 1055 (1948). Cf. Krull v. United States, 240 F.2d 122, 134, 135 (5 Cir.), cert. de-

nied, 353 U.S. 915, 77 S.Ct. 764, 1 L.Ed. 2d 668 (1957).

17. The prisoner thus would have been eligible for parole "only after the expiration of twenty years from the date he commences to serve his sentence." *Supra* note 4. Under D.C.Code § 24–203 (1961), a sentence of life imprisonment required a minimum sentence not to "exceed fifteen years' imprisonment."

18. "Such a motion is essentially a plea for leniency and presupposes a valid conviction." Poole v. United States, 102 U.S.App.D.C. 71, 76, 250 F.2d 396, 401 (1957). Fed.R.Crim.P. 35 provides that the District Court "may reduce a sentence * * * within 60 days after receipt of an order of the Supreme Court denying an application for a writ of certiorari."

19. By October 5, 1962 when argument upon the motion was heard, more than four years had elapsed since the appellant had been examined at the D. C. General Hospital to determine his competency to stand trial. Of. course, he had been incarcerated throughout the intervening period.

whole record and to consider facts which "maybe didn't come out in the case." He persisted, "Of all things that could come under this statute would be this man's mental condition." The judge commented "All that has been submitted to the jury, and the jury found him guilty." There is nothing in the transcript of the October 5, 1962 proceedings to suggest that the judge then considered an inquiry into the mental condition of the appellant *as of that time.* Government counsel stood on the record of affirmance of the conviction, and saw no reason "why this court should modify *the sentence heretofore imposed."* (Emphasis added.)

As the October 5th hearing was being concluded, the judge announced his intention to take under consideration the motion to reduce sentence. He granted defense counsel time to file a supporting memorandum. Then the following occurred:

> Defense counsel: "Then at a later time we will take up the other motion, is that correct?
>
> "The Court: What other motion?
>
> "Mr. Laughlin: The *motion for a* mental examination.
>
> "The Court: I didn't know there was such a motion pending. Is there such a motion?
>
> "Mr. Laughlin: Yes * * *."

There was no further discussion of that motion on October 5th. By October 19, 1962 no such memorandum had been filed. Counsel made no proffer of testimony on any phase of the problem. It fairly may be said he had offered no help to the judge whose "discretion" he had sought to invoke. Counsel argued only that the statute was vague and was lacking in standards for determination of "factors in mitigation."

During colloquy and before the judge announced his ruling, defense counsel made no further reference to the appellant's motion for a mental examination. Thus stood the record as the judge on October 19, said:

> "It is my judgment that there are no mitigating circumstances that would warrant the Court in granting the motion to reduce or modify the sentence and, therefore, the motion is denied. I will file with the clerk a brief opinion stating my views in that regard."

The motion for reduction of sentence was denied. Without further hearing as to "circumstances" either in mitigation or aggravation, the judge in the final sentence of his written opinion filed on October 19, 1962 said:

> "Upon consideration of all of the circumstances in mitigation and in aggravation, it is the determination of the Court that the case in its opinion does not justify a sentence of life imprisonment but that the sentence shall be governed by the provisions of law in effect prior to the effective date of Public Law 87–423." [20]

■■ The course of proceedings as this record shows, had clearly become inverted, for the ruling came without consideration of the pending motion for a mental examination. That motion, on file since October 2, 1962, had asked "for a complete mental examination at this time." It was supported by the unrefuted affidavit of the appellant's sister.[21]

---

20. There had been only argument by counsel that the judge should "consider circumstances." Procedurally, the relief possibly to be available under the amendatory Act had become elided with the appellant's prayer for a hearing on his motion for reduction of sentence. There had been neither allegations of fact nor other showing in respect of whichever course the defense intended to pursue. Were this not a capital case we might perceive a waiver in either event. Cf. Williams v.

Oklahoma, 358 U.S. 576, 583, 79 S.Ct. 421, 3 L.Ed.2d 516 (1959), and note the remarkable similarity of the Oklahoma statute, § 973, to that of our amendatory Act. *Id.,* 358 U.S. at 582 n. 6, 79 S.Ct. at 425, 3 L.Ed.2d 516.

21. Dated September 25, 1962 the affidavit reads:

"AFFIDAVIT OF EMMIE BEASLEY

"Emmie Beasley, being first duly sworn on oath as required by law, de-

It is our conclusion since life was at stake, the judge on October 19, 1962 should not have acted upon the motion for reduction of sentence without consideration of adequate information as to the appellant's mental condition or possible lack of mental competency *as of that date*. Such an examination might have disclosed that the appellant then was unable to understand the nature of the proceedings and to assist his counsel or to make allocution in his own behalf. Had such lack of mental competency appeared, for as long as that condition might continue, the law would have required that the death sentence not be executed and that the appellant be committed to a mental institution. On the record here, we conclude that an examination of such scope and depth as we have noted was an imperative prerequisite that there might be a determination of present competency.

## IV

It fairly appears that defense counsel had hoped—without more—to procure a favorable ruling simply upon the basis of argument of the motion for reduction of sentence. When on October 19, 1962 he saw that relief was thus denied, he turned to the motion for mental examination.

Government counsel informed the judge: "We do not oppose the motion, but we must say to the Court that we don't advocate it either and ask that the Court allow it. We feel that it is a matter for the Court." Government counsel added that an examination, if ordered,[22] should relate only to "his present mental competency." The judge agreed "The only question now before the Court is his present mental condition." Defense counsel concurred. The judge announced he would grant the motion "in view of the seriousness of the case and the consequences." As he later correctly observed:

"It seems to me that what I am facing up to is the matter of the duty of the Court, what you might call the common law duty of the Court to determine the question of this man's present mental condition, as to whether or not the sentence should be carried out."

The judge thus succinctly went to the heart of the problem, with a complete awareness of its implications. Certainly no right of trial by jury is essential.[23] "A jury having found a verdict

poses and says that she is the sister of the defendant Willie Jones. Affiant visits him regularly at the District Jail. She says that it has been apparent to her and to other members of the family that he is deteriorating mentally. He has lapses of memory, is very much depressed and at times talks irrationally. Affiant believes that his mind is so seriously impaired that he is now suffering from a severe mental disorder and it is the wish of the family that there now be a complete mental examination by direction of this Court.
/s/ Emmie Beasley"
In Wells v. United States, 99 U.S.App. D.C. 310, 239 F.2d 931 (1956), this court *en banc* observed that Wells had been found competent when *sentenced*, but there had been no determination that he was competent when tried. The latter element is not in issue here. We remanded in Wells, pointing out that the trial court should order whatever examination and receive whatever evidence

might aid in arriving at a proper determination as to the appellant's mental condition. We noted the absence of evidence that the experts had interviewed the appellant's relatives, friends, or acquaintances. Here, where the appellant's record discloses a substantial background of opportunity for observation in various mental institutions as well as in the jail, it would appear that much relevant information may be available to the court through the testimony of psychiatrists and others.

22. He expressed the view that if a mental examination were to be ordered, independent psychiatrists should be appointed since the appellant had been in the District of Columbia General Hospital and in St. Elizabeths Hospital.

23. Nobles v. Georgia, 168 U.S. 398, 407, 18 S.Ct. 87, 42 L.Ed. 515 (1897); cf. Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); Brady v. State, 226 Md. 422, 174 A.2d 167 (1961).

against the plea of insanity when set up as a defence [*sic*] to conviction, subsequent insanity cannot be set up in disproof of the conviction. The plea at this stage is only an appeal to the humanity of the court to postpone the punishment until a recovery takes place, or as a merciful dispensation." [24]

We may understand that "Applications for inquiries into sanity made by a defendant sentenced to death, unsupported by facts, and buttressed by no good reasons for believing that the defendant has lost his sanity, cannot, with any appropriate regard for society and for the judicial process, call for the delays in execution incident to full judicial inquiry." [25] On the other hand, a distinguished jurist has written that the self-respect of society demands that a man not be sent "to his death on the basis of a proceeding as to his sanity in which all opportunity on his behalf has been denied to show that he is in fact in that condition of insanity which bars the State from killing him." [26]

█ Recognizing such considerations, the sentencing judge in aid of his "common law duty" [27] appointed three psychiatrists to examine the appellant. They made report that the appellant had refused communication with them. They talked with him only through cell bars.

None of the doctors was called to testify. In addition to what evidence they might have offered, there was the Beasley affidavit as to the appellant's post-conviction mental disorder. Moreover, there was much additional evidence available from various psychiatrists who had earlier examined the appellant. The Mental Health Commission unanimously had ordered the appellant's commitment, long before the trial. A current examination was in order, followed by testimony as to the findings of the experts, and the testimony of others possibly to be available as we have indicated.[28]

█ If there had thus been established a basis for a determination of post-conviction unsoundness of mind, the appellant, as we have noted, would have been committed to a mental institution. Contrariwise, if the appellant had then been found mentally competent, the amendatory Act had conferred upon the judge the power to take into account whatever considerations "should be allowed weight in deciding the question whether the accused should or should not be capitally punished * * *." [29]

We can not know what conclusion might have been reached, had the judge here with such principles in mind, conducted the permissible inquiry *before*

24. Nobles v. Georgia, supra note 23, 168 U.S. at 407, 18 S.Ct. at 91, 42 L.Ed. 515. For discussion of the problem see the opinion of Frankfurter, J., dissenting in Solesbee v. Balkcom, 339 U.S. 9, 14 (1950), with the appendix at p. 26 summarizing state legislation and judicial decisions concerning execution of death penalty where insanity intervenes after sentence, 70 S.Ct. 457, 459–460, 465, 94 L.Ed. 604. See Phyle v. Duffy, 334 U.S. 431, 68 S.Ct. 1131, 92 L.Ed. 1494 (1948); Caritativo v. California, 357 U.S. 549, 78 S.Ct. 1263, 2 L.Ed.2d 1531 (1958); and notes in 23 So.Cal.L.Rev. 246 (1950); 48 Mich.L.Rev. 1189 (1950); 72 Harv.L. Rev. 181 (1958).

25. Phyle v. Duffy, supra note 24, 334 U.S. at 443, 68 S.Ct. at 1136, 92 L.Ed. 1494.

26. Frankfurter, J., dissenting in Solesbee v. Balkcom, supra note 24, 339 U.S. at 23–24, 70 S.Ct. at 464, 94 L.Ed. 604.

27. D.C.Code § 24–301 (1961) may apply in certain situations as when "it shall appear to the court from the court's own observations, or from prima facie evidence submitted to the court, that the accused is of unsound mind or is mentally incompetent so as to be unable to understand the proceedings against him." For the definition of "prima facie evidence" as meaning "sufficient to establish the fact," see Neely v. United States, 80 U.S.App. D.C. 187, 150 F.2d 977, cert. denied, 326 U.S. 768, 66 S.Ct. 166, 90 L.Ed. 463 (1945). Cf. McIntosh v. Pescor, 175 F.2d 95, 98, 99 (6 Cir. 1949).

28. See note 21 *supra*.

29. Winston v. United States, supra note 16, 172 U.S. at 313, 19 S.Ct. at 215, 43 L.Ed. 456; cf. Williams v. People of State of New York, 337 U.S. 241, 246, 69 S.Ct. 1079, 93 L.Ed. 1337 (1949).

passing upon the motion to reduce sentence.

We remand for further proceedings consistent with this opinion.

Reversed and remanded.

WRIGHT, Circuit Judge, with whom BAZELON, Chief Judge, and FAHY, Circuit Judge, join, concurring in the result:

On March 22, 1962, Congress made an historic change in its approach to capital punishment in the District of Columbia. Henceforth, instead of a mandatory death sentence upon conviction of first degree murder, the question of death or life imprisonment will be submitted to the jury. As to pending cases where mandatory death sentences have been imposed but not executed, the trial judge "may, in his sole discretion, consider circumstances in mitigation and in aggravation and make a determination as to whether the case in his opinion justifies a sentence of life imprisonment, in which event he shall sentence the defendant to life imprisonment." This case arises under the latter provision of the statute.[1]

Willie Jones, an illiterate, was convicted of first degree murder in the triangle slaying of a male friend of his common-law wife. He received the mandatory death sentence in effect at that time. The shooting occurred in a ward of the D. C. General Hospital in which the wife was a bed patient. After committing the crime, Jones placed the gun on the end of his wife's bed and was immediately arrested by hospital police. On trial his primary defense was insanity. This court, sitting *en banc*, affirmed his conviction, five to four. Jones v. United States, 111 U.S.App.D.C. 276, 296 F.2d 398 (1961), cert. denied, 370 U.S. 913, 82 S.Ct. 1260, 8 L.Ed.2d 406 (1962).

On July 16, 1962, Jones, through his counsel, filed a motion under Public Law 87–423 "to reduce or modify" his mandatory death sentence to life imprisonment. The motion also stated that "request will be made that the Court authorize and direct a commitment to St. Elizabeths Hospital for an extended period to determine the mental capacity of the defendant at this time." On October 2, 1962, appellant filed a motion "for a complete mental examination at this time." On October 5, 1962, the trial judge denied appellant's motion to modify his sentence, stating: "It is my judgment that there are no mitigating circumstances which would warrant the Court in granting the motion to reduce or modify the sentence and, therefore, the motion is denied." On being reminded by appellant's counsel that it had not yet ruled on appellant's motion for mental examination, the court granted the motion for mental examination. The court announced that it would appoint three psychiatrists for this purpose and asked counsel for the appellant and the Government to submit suggestions.

On November 8, 1962, counsel for each side filed a list of three psychiatrists. On the same day the court appointed its panel, using two of the psychiatrists from the Government's list, none from the appellant's, and substituting a third

1. Public Law 87–423, 76 Stat. 46, 22 D.C. Code § 2404. It reads, in pertinent part: "The punishment of murder in the first degree shall be death by electrocution unless the jury by unanimous vote recommends life imprisonment; or if the jury, having determined by unanimous vote the guilt of the defendant as charged, is unable to agree as to punishment it shall inform the court and the court shall thereupon have jurisdiction to impose and shall impose either a sentence of death by electrocution or life imprisonment.
  * * * * *

"Cases tried prior to March 22, 1962, and which are before the court for the purpose of sentence or resentence shall be governed by the provisions of law in effect prior to March 22, 1962: *Provided*, That the judge may, in his sole discretion, consider circumstances in mitigation and in aggravation and make a determination as to whether the case in his opinion justifies a sentence of life imprisonment, in which event he shall sentence the defendant to life imprisonment. Such a sentence of life imprisonment shall be in accordance with the provisions of this Act."

recommended by neither. No question was raised as to the qualifications of any of the psychiatrists submitted by the parties. Appellant did object, on the ground of prejudice, to one of the Government's nominees. That psychiatrist was nevertheless named to the panel. Further objection to the same psychiatrist, after being named, was fruitless. In its order naming the panel, the court stated that "the said Doctors [will] furnish the Court with a report as to whether the defendant *is now mentally competent to understand the proceedings against him and properly assist his counsel* and whether the mental condition of the defendant is such that he understands the nature and extent of his punishment in order to assist the Court in determining whether the sentence heretofore imposed in this case should be executed." (Emphasis supplied.) The order further stated: "That the said Doctors may, if they find need so to do, employ a psychologist or psychologists to assist them in their examinations."

On November 28, 1962, the panel filed its report, stating: "We conducted this evaluation of Willie Jones on November 22, 1962 at the District jail at 9:00 A.M. Willie Jones refused to talk to us in the assigned room where he was to be brought to meet with us. We then went on to the cell block and talked to him *very briefly through the barred door.*" (Emphasis supplied.) The report [2] concluded by saying: "It is the joint opinion of the three undersigned, that Willie Jones showed no inappropriate affect, but rather was a tense individual who recognized the nature of the sentence that had been imposed upon him and it was our opinion that he was showing the severe tension in the realization and understanding of what was to happen to him." The record reflects that no action has been taken by the trial court on the report filed by the psychiatrists.

## I.

We think there was error in the approach of counsel and the court to their responsibility under Public Law 87–423. Motivated by an almost universal demand [3] for the elimination of the mandatory death sentence, Congress passed Public Law 87–423 giving the jury the right to prescribe life imprisonment in place of death on conviction of first de-

---

**2.** The entire report reads:

"November 26, 1962

"The Honorable Joseph C.
McGarraghy, Judge.
United States District Court for the
District of Columbia
Constitution Avenue and John
Marshall Place, N.W.
Washington, D. C.

"Dear Judge McGarraghy:

"We, the three undersigned, are submitting our joint report on Willie Jones, whom you asked us to see as a panel. We conducted this evaluation of Willie Jones on November 22, 1962 at the District jail at 9:00 A.M.

"Willie Jones refused to talk to us in the assigned room where he was to be brought to meet with us. We then went on to the cell block and talked to him very briefly through the barred door. He was advised why we were there and that it was under order of the Court and that we wanted to ask him some questions. He said, 'I have nothing to talk about, I am going to die, that is all there is to it, therefore, there's nothing to say.' He then turned around and walked away and would not come back. During this brief contact with him he was restless, shrugged his shoulders frequently and was quite tense, obviously.

"It is the joint opinion of the three undersigned, that Willie Jones showed no inappropriate affect, but rather was a tense individual who recognized the nature of the sentence that had been imposed upon him and it was our opinion that he was showing the severe tension in the realization and understanding of what was to happen to him. It is our opinion that he is completely oriented and understands the nature of his problem.

"Respectfully submitted,
/s/ Robert H. Groh
Robert H. Groh, M.D.
/s/ John R. Cavanagh
John R. Cavanagh, M.D.
/s/ Albert E. Marland
Albert E. Marland, Sr. M.D."

**3.** See Andres v. United States, 333 U.S. 740, 752–770, 68 S.Ct. 880, 92 L.Ed. 1055 (1948) (concurrring opinion of Mr. Justice Frankfurter).

gree murder. In order to afford persons condemned to die, but not executed, prior to the passage of the Act an opportunity to benefit from its enlightened provisions, Congress provided for *resentencing,* giving the trial judge the sole discretion to determine whether a sentence of life imprisonment or death shall be imposed. The Act does not speak in terms of "reducing or modifying" [4] the sentence. The Act refers to "[c]ases tried prior to [the effective date of the Act] and which are before the court for the purpose of *sentence or resentence.*" (Emphasis supplied.) The House Committee Report [5] likewise refers to "resentencing." It states: "In such of those cases as may come before the court for *resentencing* following the affirmation of an appeal or for any other reason, a procedure is established whereby discretion is vested in the *resentencing* judge to consider the circumstances in mitigation and in aggravation to the end he is empowered *to impose either the death penalty or life imprisonment.*" (Emphasis supplied.) Thus, the plain import of the "resentencing" language, in the Act as well as in the legislative history, is that, in effect if not in law, the sentences previously imposed are vacated.[6]

Public Law 87-423 provided for the resentencing of Willie Jones. But his counsel, instead of waiting for the court to call the case for resentencing, filed a motion "to reduce or modify the sentence." And the judge treated the motion as such, opening his memorandum opinion denying the motion: "This is a motion to reduce or modify sentence pursuant to the provisions of Public Law 87-423 approved March 22, 1962," and closing it with the ruling: "The motion for reduction of sentence is denied." In so doing, the court placed the burden on the defendant, as the moving party, to show that his sentence should be reduced to life imprisonment. While the placement of the burden on the appellant is not in terms spelled out in the court's opinion, the companion case of Coleman v. United States,[7] decided by the same judge under Public Law 87-423, leaves no doubt as to the court's position. There, in denying a similar motion, the court stated to counsel for the defendant: "It seems to me perfectly clear that under the statute you have not shown circumstances in mitigation that would warrant the Court in doing other than what the statute provides, namely, carry out the sentence which was in effect prior to the effective date of the statute." In deciding the instant case, the trial judge referred to *Coleman* as a precedent and indicated he would follow the principles there announced by him.

Public Law 87-423 does not put the burden of proof upon the defendant to show that he should not be executed. It simply states that the judge, in resentencing, "may, in his sole discretion, consider circumstances in mitigation and in aggravation." The House Committee Report explains this language: "If the factors in aggravation outweigh those in mitigation, [the judge] shall impose a sentence of death by electrocution. If, in his judgment, the factors in mitigation outweigh those in aggravation, he shall impose a sentence of life imprisonment." Thus Congress placed the burden on the court to avail itself of all relevant information which may be helpful in imposing the proper sentence. "How far considerations of age, sex, ignorance, ill-

---

4. Congress was, of course, aware of the procedure provided by Rule 35, F.R.Cr. P., for reduction of sentence. By providing for "resentencing" in Public Law 87-423, for reasons developed in the text of this opinion *infra*, it deliberately chose not to use Rule 35.

5. H.R.Rep. No. 677, 87th Cong., 1st Sess. See also S.Rep. No. 373, 87th Cong., 1st Sess.

6. Even if the meaning of the statute were doubtful, this being a capital case the doubt would have to be resolved in favor of the defendant. Andres v. United States, supra Note 3, 333 U.S. at 752, 68 S.Ct. at 885-886, 92 L.Ed. 1055.

7. D.D.C., Criminal No. 163-60 (appeal pending D.C.Cir., Nos. 17,176 and 17,-177).

ness or intoxication, of human passion or weakness, of sympathy or clemency, or the irrevocableness of an executed sentence of death, or an apprehension that explanatory facts may exist which have not been brought to light, or any other consideration whatever, should be allowed weight in deciding the question whether the accused should or should not be capitally punished, is committed by the act [8] of Congress to the sound discretion" of the court. Winston v. United States, 172 U.S. 303, 313, 19 S.Ct. 212, 215, 43 L.Ed. 456 (1899). And that discretion should be exercised with the admonition that "[i]n death cases doubts such as those presented here should be resolved in favor of the accused." Andres v. United States, supra Note 3, 333 U.S. at 752, 68 S.Ct. at 886, 92 L.Ed. 1055.

Thus the resentencing court, in making its determination in place of the jury, was required to consider the facts surrounding the crime [9] as shown in the trial record [10] plus any additional information usually available to a sentencing judge.[11] For example, the transcript made at his trial clearly demonstrates that the victim was appellant's rival for the affections of appellant's wife. Under these circumstances, the question as to what effect appellant's mental condition may have had on his act, while resolved by the jury as to appellant's legal responsibility for his crime, remained a primary consideration in any determination of a proper sentence.

Assuming that Public Law 87–423 did not in fact vacate the death sentence of Willie Jones, the responsibility of the resentencing judge under the Act would be unchanged. In any event, a full consideration of all the facts in the case was required—the emotional torment that produced such a crime, the background of the defendant, his prior record, if any, and most of all, in the circumstances of this case, his mental condition, both at the time of his act and at sentencing. Only with such in-depth consideration can the resentencing judge comply with the mandate of Congress to "consider circumstances in mitigation and in aggravation."

## II.

Other aspects of the "resentencing" procedure require attention. The court ordered a mental examination to determine whether the appellant "is now mentally competent to understand the proceedings against him and properly assist his counsel." In so doing, the court was apparently acting pursuant to Section 24–301(a) of the District of Columbia Code which provides that "[w]henever * * * prior to the imposition of sentence * * * it shall appear to the court from the court's own observations, or from prima facie evidence submitted to the court, that the accused is of unsound mind or is mentally incompetent so as to be unable to understand the proceedings against him or properly to assist in his own defense, the court may order the accused committed to * * *

8. The *Winston* and *Andres* cases interpreted 18 U.S.C. § 1111, which is the national equivalent of Public Law 87–423 in that on conviction of first degree murder the jury prescribes the punishment. Under 18 U.S.C. § 1111, however, there is no provision for sentencing by the judge in the event of disagreement by the jury.

9. See Winston v. United States, supra.

10. Appellant testified on trial that he remembered nothing of the actual shooting; that for a long period of time he had been having domestic trouble because his wife was constantly visiting and seeing the deceased Reginald Winters; that he

was in fear of Reginald Winters and that he had been assaulted by him on prior occasions. He testified that on one occasion he was severely beaten by the deceased and sought an arrest warrant against Winters. He also testified that on the day in question, as he approached the bed, the deceased approached him and pushed the railing of the bed against the appellant; that he believed at that moment the deceased was attempting to inflict a mortal wound upon him. He testified he had taken the gun to the hospital to commit suicide in his wife's presence.

11. See Williams v. People of State of New York, 337 U.S. 241, 69 S.Ct. 1079, 93 L.Ed. 1337 (1949).

[a] mental hospital" for observation as to mental competency.[12] Subsection (b) of this statute provides that if and when the defendant is found mentally competent, the criminal case against him may proceed.

Here the court proceeded to "resentence" appellant without first determining whether the defendant could understand the proceedings against him and assist his counsel in his plea for mercy. On sentencing, or even on a motion to reduce sentence, particularly in a capital case, the most persuasive, if inarticulate, plea for mercy is often made by the defendant himself. Certainly the sentencing court should make sure that this final plea for life is not jeopardized by the helpless mind of the defendant. See Rule 32(a), F.R.Cr.P., and Hill v. United States, 368 U.S. 424, 82 S.Ct. 468, 7 L.Ed. 2d 417 (1962); Green v. United States, 365 U.S. 301, 81 S.Ct. 653, 5 L.Ed.2d 670 (1961); Couch v. United States, 98 U.S. App.D.C. 292, 235 F.2d 519 (1956).

Moreover, the resentencing court, contrary to Rule 32(c) (1), F.R.Cr.P., did not even have before it a presentence report to assist it in making its awful decision. Without deciding whether the resentencing judge's discretion under the Act is reviewable, it is clear that his action taken without consideration of the information available under the procedures prescribed by the Rule cannot be sustained.

### III.

The Government concedes that under 24 D.C.Code § 301 the resentencing court, having determined that a mental examination was necessary to ascertain whether the defendant understood the proceedings against him and could assist in his defense, erred in failing to make that determination. The Government also concedes that it would have been helpful to the court, in considering matters in mitigation under Public Law 87–423, to have had before it accurate and up-to-date information concerning the mental condition of the defendant. It argues, however, that the report as eventually filed proved the defendant to be competent and that, therefore, any procedural errors which the court may have made in considering whether the appellant should live or die were harmless.

In making this argument, the Government gives a casual reading to appellant's rights. The mere fact that a mental examination report was filed does not amount to an adjudication by the court that the defendant is able to understand the proceedings against him and assist in his defense. But more than this, the report in this case would not, in any event, be a predicate for any such adjudication.

Two members of the psychiatric panel which filed the report were proposed by the prosecution. None of the psychiatrists proposed by the defense was placed on the panel. The manner in which the court's panel conducted its psychiatric evaluation is also interesting. Psychiatric evaluations are usually based on a consideration of social, environmental, physical and mental factors. Such information, for the most part, is usually obtained from the patient himself. Psychological testing ordinarily supplements this information. The testing and the observations usually proceed for a long period of time. St. Elizabeths Hospital, for example, prefers to have the patient committed for 90 days when a psychiatric evaluation is required. Here the psy-

12. Any doubt, in spite of its expressed language, as to the applicability of 24 D.C.Code § 301(a) prior to sentence was dissolved by Lynch v. Overholser, 369 U.S. 705, at page 718, 82 S.Ct. 1063, at page 1071, 8 L.Ed.2d 211 (1962), in which the Court stated: "That section [24 D.C.Code § 301(a)] permits the trial judge to act 'prior to the imposition of sentence or prior to the expiration of any period of probation,' if he has reason to believe that the accused 'is of unsound mind or is mentally incompetent so as to be unable to understand the proceedings against him.'" But, as this court has recently decided, application of § 301(a) to effect a commitment is not available where the criminal proceeding has been terminated. Cameron v. Fisher, 116 U.S. App.D.C. 9, 320 F.2d 731 (1963).

chiatric evaluation apparently took but a few seconds and was limited to observing the patient during that time through prison bars. Based on this observation, the court's psychiatric panel was able to report "that Willie Jones showed no inappropriate affect, but rather was a tense individual who recognized the nature of the sentence that had been imposed upon him and it was our opinion that he was showing the severe tension in the realization and understanding of what was to happen to him."

It is true that Willie Jones refused to cooperate with the panel, a circumstance not unusual in mental cases. But a responsible psychiatric evaluation is not limited to interviewing the patient, particularly one who will not cooperate. A social history of the patient should be obtained, the family background studied and members thereof interviewed. Jones has a family here in the District of Columbia. Persons with whom the patient is in constant contact also should be interviewed. Jones' jailers for the last five years were available for this purpose. Moreover, prior to the commission of the offense in this case, there was a full hearing before the Mental Health Commission at the time Jones was committed for mental observation on the certification of three Commission psychiatrists that he was insane. There are the reports and the testimony of the many psychiatrists who testified at Jones' trial. All or any of these would have provided the panel with more information with respect to Jones' mental condition than their few moments of observation through the prison bars. Yet none of this information was even sought.

It is quite conceivable that if the resentencing court had had occasion to make a determination as to appellant's ability to understand the proceedings against him and to assist in his defense on the basis of the report of its psychiatric panel, it would have rejected its panel's report, and possibly the panel

too. At the very least, it is possible that the court would have required the panel to seek out more information on which to predicate a judgment in a matter as serious as life or death.

We do not reach any broad constitutional issues which may be concerned with the imposition of the death penalty in this case. We would hold only that, because of procedural errors, the matter must be remanded to the District Court for resentencing under Public Law 87–423.