Don NEW dba Basin Shipyard, Libelant,

v.

The YACHT RELAXIN, No. CF 3125 BD, her engine, tackle, apparel and furniture, and Ralph Williams, Respondents, Security First National Bank, a corporation, Intervener.

No. 62-463.

United States District Court
S. D. California,
Central Division.

Dec. 28, 1962.

Higbie & Higbie, Richard A. Higbie, Balboa Island, Cal., for libelant.

M. A. Sturges, Newport Beach, Cal., for respondent.

Lillick, Geary, McHose, Roethke & Myers and Anthony Liebig, Los Angeles, Cal., for intervener.

Riedman & Dalessi, William T. Dalessi, Long Beach, Cal., for William R. Hardcastle.

MATHES, District Judge.

Libelant and the respondent Williams, joined by intervener Security First National Bank, have moved to set aside the sale of the vessel RELAXIN, conducted pursuant to orders of this Court. The grounds advanced in support of the motion are (1) that the bank was not given notice of the proceedings herein, as required by Admiralty Rule No. 125 of this Court, and (2) that the sale price was grossly unfair.

The libel *in rem* and *in personam* for labor and services rendered was filed March 29, 1962, praying a decree in the amount of $1,072.44, with interest and costs. An alias monition issued on August 21, 1962, and was duly published, commanding the Marshal of this Court to seize the RELAXIN and "to give due notice to all persons claiming the same or knowing or having anything to say why the same should not be condemned and sold pursuant to the prayer of said libel". The Marshal seized the vessel on August 28th, and on August 30th libelant, through his proctor, and respondent Williams, personally, entered into a stipulation for her release.

On September 10th, no one appearing, default was entered. On September 14th an "Interlocutory Decree Pro Confesso for Want of Answer" was entered. On September 26th, a writ of *venditioni exponas* issued, and notice was duly published by the Marshal that the RE-

LAXIN would be sold at public auction at 10:00 A.M. on October 10, 1962.

Meanwhile, libelant's proctor had learned that the intervener bank held a $17,500.00 mortgage on the vessel, and on October 5th, pursuant to an exchange of telephone calls, the bank's branch manager was informed that default had been entered and that a sale had been ordered. However, neither libelant nor the bank received any actual notice of the date fixed for the sale, and on October 10th, the RELAXIN was sold by the Marshal at public auction to William R. Hardcastle for the sum of $3,000.00.

The *in rem* process of the Admiralty Court is based upon the presumption that the fact of seizure of a vessel alone will result in prompt actual notice to all interested parties, without the necessity of formal personal notice. This presumption is clearly valid in the case of a large commercial vessel where "the owner and other persons interested in property have it in their own charge, or have placed it under the control of others who will see that the owner's interests will be protected, whenever any process shall be served upon it". [2 Benedict on Admiralty 379 (6th ed. 1940).] Moreover, as a rule, there is always someone aboard a large vessel.

But the possibility of abuse inherent in any proceeding directly against property, whether a documented commercial vessel or a small harbor craft, in satisfaction of a personal debt, has led to the use of formal communication, so as to assure some sort of more direct notice and opportunity to be heard. Hence in the proceeding at bar the monition and notice of sale were published as required by Supreme Court Admiralty Rule 10 [28 U.S.C.A.] and Local Admiralty Rule 126.

The crux of the proceeding, of course, is the formal entry of default, since only then can the vessel be sold. In recognition of this, Local Admiralty Rule 125 provides that "no decree [of default] will be entered, unless proof be furnished of actual notice of the suit to an owner or agent of the res proceeded against, or to the master of a vessel in custody * * *."

It is conceded that respondent Williams, "certificate-of-number" owner of the RELAXIN [Calif. Harb. & Nav. Code § 681], received actual notice satisfying Rule 125. But the bank, holder of a chattel mortgage upon the vessel, now claims that by virtue of its status as "legal owner" of the RELAXIN under California law, it too was entitled to actual notice of the suit and of the sale pursuant to Rule 125. For lack of such notice, the bank urges that the sale must be set aside and the default vacated.

It is now well established that certain ships' mortgages are clearly maritime contracts, and so a proper subject of Federal concern. [Detroit Trust Co. v. The Thomas Barlum, 293 U.S. 21, 55 S. Ct. 31, 79 L.Ed. 176 (1934).] But the scope of the Ship Mortgage Act of 1920, by which a preferred status is conferred upon certain maritime mortgages, is limited in general to "any vessel of the United States * * *" [46 U.S.C. § 922], meaning "any vessel documented under the laws of the United States". [46 U.S.C. § 911(4).] And the documentation provisions of the Act exempt certain noncommercial vessels, among them those of less than 5 net tons, such as the RELAXIN. [19 C.F.R. 3.5(a) (5).]

Traditional maritime law permits State action in this area, insofar as it relates to mortgages on undocumented vessels [Detroit Trust Co. v. The Thomas Barlum, supra, 293 U.S. 21, 55 S.Ct. 31, 79 L.Ed. 176 (1934)], since the status of undocumented vessels is a "maritime but local" matter of which the Federal government has expressly declined to take cognizance. [Cf.: Wilburn Boat Co. v. Fireman's Fund Ins. Co., 348 U.S. 310, 75 S.Ct. 368, 99 L.Ed. 337 (1955); Madruga v. Superior Court, 346 U.S. 556, 74 S.Ct. 298, 98 L.Ed. 290 (1954); Cooley v. Board of Wardens, 53 U.S. (12 How.) 299, 13 L.Ed. 996 (1851).]

In addition, by the Federal Motorboating Act of 1958 [46 U.S.C. § 527 et seq.], the Federal government has affirmatively relinquished much of its jurisdiction over undocumented vessels to States enacting a comprehensive system of numbering and regulation conforming to the standards set forth in that Act. California adopted such a system in 1959, which is now embodied in §§ 650–753 of the Harbors and Navigation Code.

Section 680 of that Code requires every undocumented vessel used in California waters to be numbered. Section 681 sets forth the procedures to be followed in obtaining a number, and provides in part:

"(a) * * * The application shall contain the name and address of the owner, and of the legal owner, if any. * * * Upon receipt of the application in approved form, the Division of Small Craft Harbors shall issue a certificate of ownership to the legal owner and a certificate of number to the owner, or both to the owner if there is no legal owner, stating the number issued to the vessel and the name and address of the owner.

* * * * * *

"(f) All records of the commission, the department, and the Division of Small Craft Harbors made or kept pursuant to this section shall be public records."

The term "legal owner" is defined by Section 651(g) of the Code to include a mortgagee. Section 718 provides that a chattel mortgage is not valid against creditors or subsequent purchasers or encumbrancers unless a properly endorsed certificate of ownership showing the mortgagee as legal owner is deposited with the Division of Small Craft Harbors. Section 719 makes a properly endorsed certificate deposited with the Division of Small Craft Harbors constructive notice of the mortgage, and § 720 requires the Division, upon the deposit of the certificate, to show the mortgagee as legal owner.

The bank has complied with all these requirements and, since prior to the commencement of this suit, has been recorded as the "legal owner" of the RELAXIN under State law, with respondent Williams as the certificate-of-number owner.

While these provisions of the State statute are extensive, they ultimately must accommodate to the supremacy of Federal law, and the exclusive right of this Court of Admiralty to enforce a maritime lien by *in rem* process and sale of the vessel. [The Moses Taylor, 71 U.S. (4 Wall.) 411, 18 L.Ed. 397 (1866).] Inasmuch as the sale of a vessel pursuant to an *in rem* decree is the prerogative of the Admiralty Court, any requirement of State law respecting notice of such sale infringes upon this Federal supremacy. Thus Federal law subordinates the bank's prior-in-time mortgage on an undocumented vessel to a subsequent maritime lien, leaving the mortgagee only the "remnants and surplus" of the sale. [Bogart v. The John Jay, 58 U.S. (17 How.) 399, 15 L. Ed. 95 (1854); The Lottawanna, 88 U. S. (21 Wall.) 558, 22 L.Ed. 654 (1874); United States v. Certain Subfreights Due S. S. Neponset, 300 F. 981 (D. Mass.1924); The Defiance, 3 F.2d 48 (E.D.N.C.1924).]

It is because of the role of time financing in the purchase and sale of small craft that California has made the mortgagee the "legal owner" of an undocumented vessel and has provided for notice to the world of the mortgagee's interest. Still the mortgagee of an undocumented vessel is not protected as is the holder of a preferred mortgage on a large commercial vessel, although his interest may be substantial. The present case is a typical example. Libelant's maritime lien, for which the vessel was sold, amounted to only $1,072.44, while the bank's mortgage amounted to $17,-500.00. To permit destruction of the mortgagee's security interest without actual notice of the sale, this Court would be condoning inequity as well as undermining the financial structure of the

local maritime industry. Both reason and policy dictate a contrary result.

The declared policy of the Federal Motorboating Act is "to encourage uniformity of boating laws, rules, and regulations as among the several States and the Federal Government to the fullest extent practicable * * * to encourage the highest degree of reciprocity and comity among the several jurisdictions. * * *" [46 U.S.C. § 527f.]

In response to this invitation, California has sought to accommodate its law to a supreme Federal law. By drawing upon its experience in the registration of automobiles, designating the holder of a registered chattel mortgage as "legal owner" of an undocumented vessel, and the mortgagor as the certificate-of-number owner, the State has made available a simple means of identifying the two parties primarily interested in the vessel for the purpose of giving notice of *in rem* proceedings. In my opinion the policy of the Federal Motorboating Act and justice as well can be furthered, if Federal law is here required to make a reciprocal accommodation to State law. [Cf., Kossick v. United Fruit Co., 365 U.S. 731, 81 S.Ct. 886, 6 L.Ed.2d 56 (1961).]

I therefore hold that Admiralty Rule 125 of this Court requires that actual notice of *in rem* proceedings against undocumented vessels be given to both the certificate-of-number owner and the "legal owner" as their names and addresses appear on the records of the Division of Small Craft Harbors, pursuant to the requirements of § 650 et seq. of California's Harbors and Navigation Code.

I further hold that a copy of the published notice of sale must be served in person or by mail on both such owners, in advance of the time fixed for such sale, in order for the sale at public auction of an undocumented vessel pursuant to writ of *venditioni exponas* issued out of this Court to constitute a fair sale. [Cf., Schroeder v. City of New York, 83 S.Ct. 279 (1962).]

Since the required notice of the time and place fixed for the sale was not given to either the intervener bank or to the libelant, the sale of the RELAXIN must be set aside, and the default as to the intervener bank must be vacated.

Disposing of the case on this ground, it is unnecessary to reach the contention that the vessel was sold for a grossly inadequate price.

Inasmuch as the purchaser at the sale held on October 10, 1962, is blameless for all irregularities attendant upon the proceedings, the order to be entered will be conditioned upon the bank's willingness to pay all costs of that sale and all reasonable and necessary costs of safekeeping the RELAXIN since that sale, and all reasonable and necessary expenses, other than attorney's fees and costs of opposing the intervener's motion to set aside the sale, which may have been incurred by the purchaser incident to the sale, so that the purchaser can be made whole to the extent of the bid price of $3,000.00, with interest thereon at the rate of 7% per annum from and after October 10, 1962, until the date repayment of said sum is made or tendered.