**UNITED STATES of America**

v.

**STEEL TANK BARGE H 1651, her Engines, Equipment, Tackle and Apparel.**

**No. 7993.**

United States District Court
E. D. Louisiana,
New Orleans Division.

March 28, 1967.

John Poitevent, Phelps, Dunbar, Marks, Claverie & Sims, New Orleans, La., for defendant.

Keith M. Whipple, Himel & Whipple, Houma, La., for purchaser at judicial sale.

HEEBE, District Judge:

 "No person shall * * * be deprived of * * * property, without due process of law." U.S.Const., Amendment V. The delineation of the elements necessarily embodied in the concept Due Process has been a continuing process since the beginning of the Republic; in more recent years problems involving the companion Fourteenth Amendment limitation on state power have overshadowed those concerning limitations on federal power. Whatever results from the continuing remolding and discovery of what Due Process requires, its fundamental requisite is the opportunity to be heard.[1] Grannis v. Ordean, 234 U.S. 385, 394, 34 S.Ct. 779, 58 L.Ed. 1363 (1914). Although the notice required to effectuate the opportunity to be heard may differ as particular situations differ in factual and legal composition, both the Fifth and Fourteenth Amendments require notice as a requisite to Due Process.[2]

 Although recent developments in the constitutional requirements of Due Process have been more concerned with criminal and civil than with admiralty matters and more concerned with state than with federal procedures, the Fifth Amendment does operate as a limitation on the power of courts of the United States in admiralty matters. Even

Louis C. LaCour, U. S. Atty., Ernest N. Morial, Asst. U. S. Atty., New Orleans, La., for plaintiff.

1. *"Audi alteram partem*—hear the other side!—a demand made insistently through the centuries, is now a command, spoken with the voice of the Due Process Clause of the Fourteenth Amendment, against state governments, and every branch of them * * *." Frankfurter, J., dissenting in Caritativo v. People of State of California, 357 U.S. 549, 558, 78 S.Ct. 1263, 1267, 2 L.Ed.2d 1531 (1958). For an excellent article tracing this maxim through the centuries from Greek and Roman antiquity, see John M. Kelley, Audi Alteram Partem, 9 Natural Law Forum 103 (1964). Mr. Kelley sees a dichotomy of purpose in the principle: where it is now thought of as a rule of natural *justice*, it was also regarded as a rule of *wisdom*—though the concepts overlap, justice suggests the effect of a correct decision as seen from the point of view of those affected, whereas wisdom concentrates on the quality of mind of the person producing the decision.

2. Doctrines that have evolved as a solution to notice problems arising under one of the Amendments should be considered as equally applicable to problems arising under the other Amendment.

though the requirements necessary to constitute notice requisite for Due Process in admiralty *in rem* proceedings are perhaps the least demanding known to the law, considering the worldwide practical effect of the judgments entered,[3] still, as in all other areas of the law, notice is required. The abstract standard for notice is the same throughout the law—notice reasonably calculated under all the circumstances to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections. Mullane v. Central Hanover Bank & Trust Company, 339 U.S. 306, 314, 70 S.Ct. 652, 94 L.Ed. 865 (1950). Circumstances may alter the extent and nature of the concrete efforts required, but the abstract standard remains the same. "The means employed must be such as one desirous of actually informing the absentee might reasonably adopt to accomplish it." *Mullane,* supra, at 315, 70 S.Ct. at 657. In *in rem* admiralty matters generally, the concrete efforts required have been a minimum, and notice is regarded as served upon the thing itself because "this is necessarily notice to all those who have an interest in the thing, and is reasonable because it is necessary * * *." The Mary, 9 Cranch (13 U.S.) 126 (1815), 3 L.Ed. 678. "The *in rem* process of the Admiralty Court is based upon the presumption that the fact of seizure of a vessel alone will result in prompt, actual notice to all interested parties, without the necessity of formal personal notice. * * * But the possibility of abuse * * * has led to the use of formal communications, so as to assure some sort of more direct notice and opportunity to be heard. Hence * * * the monition and notice of sale [are] published as required by Supreme Court Admiralty Rule 10 [now Supplemental Rule C(4), F.R. Civ.P.]." New v. Yacht Relaxin, 212 F. Supp. 703, 704 (S.D.Cal.1962). The Supreme Court has recognized that publication is an unreliable means of acquainting parties of the fact that their rights are before the courts, but that it "traditional-ty has been acceptable as notification supplemental to other action which in itself may reasonably be expected to convey a warning * * * [for example] libel of a ship" and must also be accepted in that class of cases where "it is not reasonably possible or practical to give more adequate warning," *Mullane,* supra, 339 U.S. at 315–317, 70 S.Ct. 658.

With this background in mind, we turn to the issues and facts presented in the matter before us. The former owner of a barge asks the Court to rescind its order confirming the interlocutory sale of the barge, asserting principally that there was inadequate notice to it of the sale.

The Steel Tank Barge H 1651 was owned by Hawkins Towing and Barging Company of Beaumont, Texas. On May 27, 1964, the United States Attorney for the Eastern District of Louisiana received a report from the United States Army Engineer District, New Orleans, Louisiana, alleging that the barge had on May 12, 1963, leaked oil in the Algiers Lock in violation of the Oil Pollution Act, 33 U.S.C.A. §§ 431–437. The report indicated that the registered agent of Hawkins Towing for service of process was J. F. Hawkins, Post Office Box 848, Beaumont, Texas. On June 24, 1964, the United States Attorney sent to Mr. Hawkins and the company at the post office box address a letter concerning the oil discharge incident, demanding the full penalty, $2,500.00, provided by the statute and giving notification that the United States intended to file a libel *in rem* against the vessel and cause its seizure if no reply was received within fifteen days of the date of the letter. The letter was received, but no reply was forthcoming.

On May 19, 1965, the United States Attorney sent a similar letter to the Beaumont post office box address. This letter was by certified mail, and the return receipt showed that an Earl Woodell, who was an employee of Hawkins, received the letter. No reply to that letter was forthcoming.

---

3. See The Law of Admiralty, Gilmore & Black, § 9–85, pp. 640–41.

This libel *in rem* was filed on February 18, 1966, seeking recovery of the statutory penalty for the oil discharge incident. By certified mail the United States Attorney sent a copy of the libel and a letter of transmittal to Mr. J. E. Hawkins, Hawkins Towing and Barging Company, Inc., P. O. Box 848, Beaumont, Texas. The certified mail was returned marked "unclaimed." On March 9, 1966, the letter of February 18 and a copy of the libel was remailed by certified mail to Mr. J. E. Hawkins, Hawkins Towing and Barging, Inc., Beaumont, Texas, and was again returned marked "unclaimed."

██ Upon filing the libel, the United States requested that the Federal Bureau of Investigation locate the barge. The FBI reported to the United States Attorney that it had been told by Earl B. Woodell that the barge was leased to Union Oil Company of California. Later, the United States Attorney was informed that the barge was located on Lake Pagie in Terrebonne Parish, Louisiana. Thereupon, on June 8, 1966, the barge was seized by the United States Marshal, who served the admiralty warrant upon Victor Weber, an employee of Union Oil Company of California. The Marshal valued the barge at $25,000.00.[4] The notice of seizure was published on June 24, 1966, in the Houma Courier pursuant to the then effective Admiralty Rule 10 and the Local Rules of this Court. The barge was located at a Union Oil Company operation some fifteen miles out in the lake where Union Oil had several oil storage tanks. This barge was being used as an overflow tank, i. e., when the regular tanks were full, additional oil would be stored in this barge. The Mar-

shal's office, on learning that the barge was not being used for towing purposes, but rather just for storage purposes, had no objection to the continued use of the barge, so long as it was not moved. Thereupon the Marshal placed a keeper on the barge who remained on the Union Oil Company island until September 27, 1966, at a cost of $30.00 a day pay for the keeper and $2.00 a day for his lodging at the Union Oil Company island—a total cost of over $3,500.00 for the three and a half month period.

Because of the length of time that had passed without any claim having been made, and because of the amount of the keeper's expenses, the United States moved on August 24, 1966, for an interlocutory sale of the barge pursuant to Rule E(9) (b) of the Supplemental Rules for Certain Admiralty and Maritime Claims. F.R.Civ.P.

The order for the interlocutory sale pusuant to Title 28 U.S.C.A. § 2004, prepared by the United States Attorney and signed by the Court, directed that notice be given by "publication in newspapers of general circulation in the Parishes of Terrebonne and Orleans, State of Louisiana, including the New Orleans States-Item, not less than three times within ten days, and by proclamation on the date of sale." The publications and sale were conducted as ordered; the barge was sold on September 16, 1966, to Albert Delaune for $13,000.00.

Thereafter, on October 4, 1966, no objections to the sale having been filed, the United States Attorney moved for confirmation of the sale, and this Court approved and confirmed the sale. On October 18, 1966, Hawkins Towing

---

4. Hawkins had the barge appraised in April 1965 at $45,000. Our decision herein does not rest on acceptance of that valuation as accurate, but this figure is not unreasonable in the light of the $1,650 per month charter hire.

Mere inadequacy of price is not sufficient to warrant the Court's setting a sale aside. The inadequacy must be gross or exist in combination with some other factor, such as fraudulent conduct on the part of the purchaser, a combination to restrict the bidding, or a lack of attendance of buyers. See Ballentyne v. Smith, 205 U.S. 285, 27 S.Ct. 527, 51 L.Ed. 803 (1907); The Planter, 163 F. 667 (E.D.S.Car.1908). However, our view of the problem before us, and our decision, are based on sufficiency of notice, not adequacy of price; where lack of notice is shown, there may not be a need to demonstrate any inadequacy of price.

moved to restrain further proceedings in this matter, which restraining order the Court entered and has kept in effect until this date. On November 2, 1966, Hawkins Towing moved to vacate and set aside the confirmation of the sale.

The affidavits and exhibits filed by Hawkins Towing indicate that it had no notice of the seizure and subsequent sale of its barge until October 17, 1966. Apparently Union Oil Company, the lessee of the barge, continued to pay the charter hire of $1,650.00 per month through August 31, 1966, without notifying Hawkins Towing of the seizure of its barge. On September 30, 1966, Hawkins routinely forwarded its invoice for the hire for the month of September. On October 14, Union Oil wrote Hawkins, returning the invoice and stating that it should be charged only through September 16 for "at this time the barge was bought from you." This letter was received October 17, 1966, and Hawkins claims that this was its first notice of any seizure or sale of its barge.

As a preliminary observation, it is clear that the conduct of the sale was in strict compliance with the applicable statutes, rules of procedure and orders of this Court, and we have no doubt that the scheme provided therein for interlocutory sales of vessels generally satisfies the constitutional requirement of notice. The scheme is reasonably calculated to result in actual notice through the seizure itself, the publication of the monition and the publication of the sale. Further, we note that in this particular case, the United States Attorney made additional effort through the use of certified mail to actually notify the owner. Nonetheless, and well aware that the motion filed in this hard case may be a request for bad law, we feel compelled to hold that, in the peculiar facts of this case, the notice requirement inherent in Due Process was not satisfied. Through the fault of no one, the normally sufficient scheme operated inadequately.

■ Judicial sales in admiralty *in rem* proceedings are effective against the whole world even as to those without notice. Thus, in a properly conducted proceeding *in rem*, a judgment and sale will operate to execute and extinguish all liens and claims against the vessel, even where the lienholders have absolutely no notice of the proceeding. See footnote 3, supra. This extinction of rights is constitutionally permissible because there is no practical alternative, that is, no way to get actual notice to unknown lienholders around the world, and it is thus reasonable because necessary. The Mary, supra, 9 Cranch at 143. The seizure itself must operate as notice.

■ Here, however, the seizure did not operate as notice. The barge was in the possession of a lessee. The Marshal's seizure of the vessel allowed its continued use by the lessee under a status effectively unchanged from that prior to the seizure. Although it seems unusual to us that the lessee did not notify the owner of the seizure, the fact is that he did not so notify the owner, and in view of the notification he later gave, after the sale, upon receipt of the September invoice, the only explanation for the failure is the unchanged status of the vessel—the seizure had no practical effect upon the lessee, and he thus took no action. But the constitutionality of the proceedings depends in part on the notice effected by the seizure, and here the treatment of the vessel subsequent to seizure operated to eliminate the notice to the owner that we could assume would have been forthcoming from the lessee had the vessel been withdrawn from use.

Here we hasten to assert that our comments above are in no way a criticism of the Marshal. In fact, the decision to allow the barge to remain in use was, so long as the barge was not moved, a mandatory one and, in any event, even in retrospect, a wise and prudent one. However, the unusual nature of the use of this barge, as a stationary rather than a mobile object, reduced the chances that actual notice would result from the seizure; and where the seizure is less likely to result in actual notice, then the rationale for permitting publication, which is concededly ineffective, to be con-

sidered as notice disappears. It is permissible, constitutionally, for notice to be provided through seizure and publication, but where the effect of seizure is diminished, then the effect provided by publication should be increased. Thus, in view of the continued unhampered use of the barge and his knowledge of the identity of the owner, the United States Attorney should have taken additional steps beyond the publication required by statute to assure that adequate notice was given.

Here we must point out that the United States Attorney cannot be faulted for his efforts in that regard. He took the additional precaution of sending, via certified mail, copies of the libel to the owner of the barge. However, these were returned unclaimed, and we feel compelled to hold that these efforts of the United State Attorney were insufficient. We are here dealing with constitutional limitations on the power of this Court, but we have also the power of the Executive Branch aligned against the barge owner. It would be unconscionable to the Court to hold that the vast power and resources of the Federal Judiciary and Executive could not get actual notice of this suit and sale to the barge owner. He was not a mere unknown lienholder, but a known owner. "The means employed must be such as one desirous of actually informing the absentee might reasonably adopt to accomplish it." *Mullane,* supra, 339 U.S. at 315, 70 S.Ct. at 657. We believe that a judgment as to the adequacy of the means employed must turn, to some extent, on the resources available to the parties so employing them. Here the resources included an FBI agent who discussed with the absentee the locale of the barge—at that time he could have given actual notice of the pending proceedings to the barge owner. Certainly no considerations of secrecy were involved, as the United States was at that time attempting by other means to effect such a notification. Where the vast resources and facilities of the United States are involved, the giving of actual notice to at least a known owner is not an unreasonable requirement.

Perhaps the fault lies with the Court for authorizing this sale in a pro forma manner without an adequate check into the circumstances involved. We were wholeheartedly in agreement with the recent changes in Rule 65(b), F.R.Civ.P., with regard to the need for notice prior to the issuance of temporary restraining orders and have insisted in every case, in accordance with the comments of the Advisory Committee, that "some expedient, such as telephonic notice to the attorney for the adverse party, be resorted to if this can reasonably be done." Our failure to insist on a telephone call in this matter was inexcusable where the United States was a party, where the barge was worth at least eight, and probably sixteen, times the amount of the maximum claim against it, where no judgment for any amount had yet been entered, and where the owner's identity was known. In the future the Court will not order interlocutory sales without telephonic communication with the known owners; in this matter the sale must be set aside.

We are not unmindful of the excellent arguments, both oral and written, presented by counsel for the purchaser of the barge. We are also not unmindful of his warning that a decision adverse to him would impair confidence in judicial sales in admiralty. We therefore expressly indicate that our holding herein depends solely on the peculiar facts and circumstances involved whereby a number of factors, each insufficient to require setting the sale aside, combine to result in a lack of adequate notice: the claimant's identity being known, the effect of the seizure made, the failure of the letters to be claimed, the plaintiff being the United States, the FBI agent's communication with the owner, and the sale being made prior to judgment. All these factors in combination made it imperative that the United States use whatever additional means it would reasonably adopt to actually notify the owner of the pendency of these proceedings. Here

all that was needed was a telephone call from New Orleans to Beaumont at negligible expense to the United States.

We are also not unmindful that the apparently completely innocent party here is the purchaser of the barge at the judicial sale. While the original owner can be faulted to some degree for not answering the demands made by letter by the United States and for not being more alert to the status of the barge following the communication from the FBI agent, the purchaser cannot be faulted at all, unless it be for attempting to hold on to a bargain purchase. Accordingly, as a condition to the Court's setting this sale aside, the original owners of the barge must reimburse the purchaser for all his expenses and costs incident to the attempted purchase, so to as great an extent as possible return him to his condition prior to the publication of the notice of sale.