IN RE KEATON.

(No. 9447—Decided June 12, 1969.)

*Mr. Emanuel Nadlin*, on behalf of Cleo Vernon Keaton.

*Mr. Roy H. Huffer, Jr.*, prosecuting attorney, on behalf of Pickaway County.

Leach, J. Cleo Vernon Keaton was found guilty by a jury in the Court of Common Pleas of Pickaway County of first degree murder, involving two counts of the indict-

ment. As to the second count, the jury did not recommend mercy, and Keaton was sentenced to death.

Thereafter the Court of Appeals for Pickaway County affirmed the judgment. *State* v. *Keaton* (1967), 9 Ohio App. 2d 139. Leave to appeal was then denied by the Supreme Court of Ohio, and the U. S. Supreme Court denied certiorari.

On November 4, 1968, the Warden of the Ohio Penitentiary addressed a letter to a Judge of the Common Pleas Court of Franklin County, under the provisions of Section 2949.28, Revised Code, advising him that Keaton appeared to be insane, and requesting the court to conduct a hearing. Upon receipt of the letter, that court suspended the execution then set for November 8, 1968, and ordered Keaton sent to Lima State Hospital for observation and report. Thereafter the court scheduled such hearing for January 2, 1969, but at the request of Emanuel Nadlin, who had represented Keaton at the trial and on appeal, the hearing was rescheduled and later held on January 27, 1969. At that time the court permitted Mr. Nadlin to present evidence, and the witnesses who so testified (the warden, a psychologist, four doctors, and Mr. Nadlin himself) also were questioned by the Prosecuting Attorney of Pickaway County and by the court. A doctor from Lima State Hospital, called on behalf of the court, also testified and was examined by both Mr. Nadlin and the prosecuting attorney.

By decision of April 1, 1969, and by entry of April 10, 1969, the court found that Keaton was "not insane." Thereafter the court by entry of April 28, 1969, reinstated the date of execution, and fixed same as June 20, 1969.

Notices of appeal have been filed in this court by Mr. Nadlin, designating Cleo Vernon Keaton as appellant, and appealing from the decision and orders of the Common Pleas Court.

This case has been submitted to the court on the bill of exceptions, consisting of the testimony taken before Judge Gessaman of the Common Pleas Court, the brief filed by Mr. Nadlin on behalf of Keaton, and the brief

filed by the Prosecuting Attorney of Pickaway County.

For the reasons hereafter stated we conclude that this appeal should be dismissed.

## I.

The first question presented by this case concerns the basic nature of the proceedings in the hearing before the Common Pleas Court.

It is a firmly established tenet of our law, inherited from the common law, that an insane person ought not to be punished while he remains in that condition—under the common law a prisoner awaiting execution of death sentence had no absolute right to a hearing on the question of his present sanity. Instead the matter was addressed to the discretion of the *trial* judge. 21 American Jurisprudence 2d 160; 24 Corpus Juris Secundum 921; *State, ex rel. Lyons,* v. *Chretien* (1905), 114 La. 81, 38 S. 27; *Bulger* v. *People* (1916), 61 Colo. 187, 156 P. 800; *Davidson* v. *Commonwealth* (1917), 174 Ky. 789, 192 S. W. 846; *State, ex rel. Alfani,* v. *Superior Ct.* (1926), 139 Wash. 125, 245 P. 929, 49 A. L. R. 801. This common-law rule relating to investigation to determine the sanity of a prisoner under a death sentence has been modified by statute in some states, including Ohio.

The Ohio statutes providing for such proceedings read as follows:

Section 2949.28:

"If a convict sentenced to death appears to be insane, the warden or the sheriff having custody of such convict shall give notice thereof to a judge of the Court of Common Pleas of the county in which the prisoner is confined. Said judge shall inquire into such insanity at a time and place to be fixed by said judge, or impanel a jury for that purpose and shall give immediate notice thereof to the prosecuting attorney of the county in which the prisoner was convicted."

Section 2949.29:

"In addition to the warden or sheriff, the judge of the Court of Common Pleas, clerk of the Court of Common Pleas, and prosecuting attorney shall attend the inquiry

commenced as provided in Section 2949.28 of the Revised Code. Witnesses may be produced and examined before the judge or jury, and all findings shall be in writing signed by the judge or jury. If it is found that the convict is insane, the judge shall suspend the execution until the warden or sheriff receives a warrant from the governor directing such execution. The finding, and the order of such judge, certified by him, shall be entered on the journal of the court by the clerk.''

Section 2949.30:

"If a convict under sentence of death is found insane under Section 2949.29 of the Revised Code, and if he is subsequently restored, the warden or sheriff having custody of such convict shall forthwith transmit a copy of the finding of restoration to the governor, who, when convinced that the convict is of sound mind, shall issue a warrant appointing a time for his execution.''

A comparison of the Ohio statutes with the statutes of other states and an examination of the holdings of such other states as to the nature of such proceedings lead us to the conclusion that such proceedings are not adversary in nature. In this connection we are in basic agreement with the language of the opinion of the Supreme Court of California in *People* v. *Riley* (1951), 37 Cal. 2d 510, 235 P. 2d 381, where that court, interpreting very comparable statutes, stated (page 513):

"From a reading of these statutory provisions, it is apparent that the instant proceeding, initiated after final judgment, is not one to determine the guilt or innocence of a defendant, but is an anomalous proceeding provided by statute to determine whether the judgment of conviction, having become final, should be presently executed. In line with the humane principle expressed in Section 1367 of the Penal Code that no person shall 'be * * * punished for a public offense, while he is insane,' the sole purpose of this collateral proceeding is to determine whether a defendant who has been sentenced to death is 'presently sane.'

"But there is no real finality to any verdict or order

entered in such proceeding. Recognizing that the mental condition of a convicted person may change from time to time, there is statutory provision for the determination of a defendant's restoration to sanity following an adjudication of his insanity at the time of the prior inquiry into the matter * * *.

"A study of the historical background of the cited statute does not disclose that a convicted person, who may become insane following his conviction, has any constitutional or inherent right to have the execution of his sentence suspended by reason of such insanity. At common law the granting of an application for such suspension appears to have been discretionary with the court or the executive power in the exercise of clemency, as a merciful dispensation, an act of grace. In such cases there was no absolute right to a hearing and the ruling of the trial court was not subject to review by appeal. (Blackstone's Commentaries, Book IV, pp. 395-396 [Cooley's Fourth Ed., 1899, Vol. II, pp. 1523-1524]; *State, ex rel. Lyons,* v. *Chretien,* 114 La. 81 [38 So. 27, 28]; *People, ex rel. Best,* v. *Eldred,* 103 Colo. 334 [86 P. 2d 248, 249-250].) The same humane considerations which early prompted the court or the executive to exercise the power to grant suspensions in such cases probably motivated our Legislature in adopting the cited statutory provisions.

"Under these circumstances, it seems clear that a convicted person awaiting execution has only such rights and remedies as may be conferred by the statutory provisions, and that these provisions should be construed in the light of their historical background. To this point, it has been held that after conviction and the imposition of sentence, due process of law does not require that a judicial hearing be held to ascertain the 'present' sanity of a convicted person (*Nobles* v. *Georgia,* 168 U. S. 398, 405-409 [18 S. Ct. 87, 42 L. Ed. 515]) or that the determination of such question be subject to judicial review (*Solesbee* v. *Balkcom,* 339 U. S. 9, 12-13 [70 S. Ct. 457, 94 L. Ed. 604]).

"Moreover, it is plain that while there is adequate

statutory provision for the protection of a defendant who may have become insane after his conviction and sentence (*People* v. *Sloper*, 198 Cal. 601, 607-608 [246 P. 802]), the prescribed inquiry does not purport to be a true adversary proceeding surrounded by all the safeguards and requirements of a common-law jury trial. (*Nobles* v. *Georgia*, *supra*, 168 U. S. 398, 405.) The rights of a defendant as an offender on trial for an offense are not involved. But if, following his conviction and his delivery to the warden of the state prison for execution, there is good reason to believe that a defendant under judgment of death has become insane, the warden must call such fact to the attention of the district attorney of the county in which the prison is situated, and the latter, *not the defendant*, petitions the court for a hearing before a jury, a proceeding which is distinguished by its designation as an 'inquiry.' * * * No provision is made for the assignment of counsel or notice of hearing to the defendant, but only the district attorney is required to attend the hearing. * * *''

The *Riley case*, decided in 1951, made reference to two United States Supreme Court decisions referred to above, *Nobles* v. *Georgia* and *Solesbee* v. *Balkcom*. Thereafter, the basic reasoning of *Riley*, relying in part on *Solesbee*, was repeated by the United States Supreme Court in *Caritativo* v. *California* (1958), 357 U. S. 549, 2 L. Ed. 2d 1531, 78 S. Ct. 1263. *Caritativo* held that "due process" did not require a state to accord to a convict found guilty and awaiting execution a judicial hearing on the question of his present sanity. We quote from the opinion of Harlan, J., at page 550:

"* * * At the post-conviction stage of a capital case, it seems to me entirely proper for the State to condition a prisoner's right to a sanity trial upon a preliminary determination by a responsible official that 'good reason' exists for the belief that the prisoner has become insane. Surely it is not inappropriate for California to lodge this grave responsibility in the hands of the warden, the official who beyond all others has had the most intimate relations with, and best opportunity to observe, the prisoner. And

having regard to the natural and impelling impulse of lawyers representing condemned men to stave off their execution as long as possible, I also think it constitutionally permissible for the State to conclude that such a preliminary determination should be made ex parte. It is a legitimate consideration for California to take into account that an adversary proceeding on the issue of probable cause might open the door to interminable delaying maneuvers in capital cases, contrary to the sound administration of justice. * * *"

In *Riley, supra*, it was held that convicted persons awaiting execution have only such rights and remedies as might be conferred by statutory provisions, that such provisions should be interpreted in the light of their historical background, and that where the legislature has provided for a judicial inquiry as to the sanity of a convict awaiting execution the convict, being the subject of the inquiry, but not a party thereto, has no right of appeal. This same interpretation is followed in *Bingham* v. *State* (1946), 82 Okla. Cr. 305, 169 P. 2d 311. See, also, 4 American Jurisprudence 2d 679; 24 Corpus Juris Secundum 930.

Where such a special proceeding results in the conclusion that the convict is sane, the recourse of the convict, if any, is not by appeal, but a request for executive clemency. Then, too, it might be noted that in the event the warden, who is the only person authorized to initiate such proceedings, concludes that the court was wrong, his only recourse is a recommendation to his administrative superior, the governor, who, under Article III, Section 11 of the Ohio Constitution, has substantially unlimited power to grant reprieves.

For the reasons heretofore stated we conclude that this purported appeal on behalf of Keaton must be dismissed.

## II.

In view however of the novelty of the question decided under part I of this opinion, so far as Ohio is concerned, we have also carefully examined the bill of exceptions and the issues which would be before this court in the event the

determination by the Common Pleas Court were to be construed as appealable.

From this examination we would conclude that the Common Pleas judge, as the trier of the *fact* in the proceedings in that court, was not guilty of any abuse of discretion in coming to the conclusion he did, nor was his finding against the manifest weight of the evidence. He had the right to weigh the evidence as presented to him at that time, which he did.

While it is true that a review of such evidence clearly indicates that Keaton is "mentally ill," in the *medical* sense, and in that sense probably even "seriously mentally ill," this, in our opinion, is not the test of whether a "convict is insane" within the purview of Section 2949.29, Revised Code.

Such test, of course, is not the test of "insanity," which is applied as to the issue of not guilty by reason of insanity. There the test is whether "disease or other defect of his mind had so impaired his reason that, at the time of the criminal act with which he is charged, either he did not know such act was wrong or he did not have the ability to refrain from doing that act." *State* v. *Staten* (1969), 18 Ohio St. 2d 13.

In *State, ex rel. Townsend,* v. *Bushong* (1946), 146 Ohio St. 271, it was held that the test of present insanity, in a sense of being able to stand trial, is "whether the accused has sufficient soundness of mind to comprehend his position, to appreciate the charges against him and the proceedings thereon, and to enable him to make a proper and rational defense." The court also concluded that "a person accused of a crime is to be deemed sane within the meaning of this rule although on some other subjects his mind might be deranged or unsound."

In our opinion the test of whether a convict is "insane" within the purview of Section 2949.29, Revised Code, is essentially comparable. The test applied generally by other states, and which we approve, is "whether the prisoner has sufficient intelligence to understand the nature of the proceedings against him, what he was tried for, the pur-

pose of his punishment, the impending fate which awaits him, and a sufficient understanding to know any fact which might exist which would make his punishment unjust or unlawful, and the intelligence requisite to convey such information to his attorneys or the court." 21 American Jurisprudence 2d 158; 24 Corpus Juris Secundum 929.

We conclude, therefore, that the Common Pleas Court applied the proper test of insanity within the purview of Section 2949.29, Revised Code.

One additional comment should be made as to the question of the proper test. Section 2949.30, Revised Code, provides that if a convict under sentence of death be found insane and if he is "subsequently restored," a copy of the finding of "restoration" shall be sent to the governor, who, when convinced that the convict is of "sound mind," shall issue a warrant setting a date for his execution.

It is asserted on behalf of Keaton in oral argument that the language, "sound mind," necessarily refers to a mind that is *completely* sound, and that thus *any* "mental illness" would preclude the "appointing of a time for his execution," thus indicating a legislative intent that the test of "insanity" under Section 2949.29 is any degree of mental illness, and, thus, that any person, awaiting execution, found to be "mentally ill" must have his execution suspended.

This reasoning we reject. It is not supported by the case law applicable to the interpretation of "insanity" of convicts awaiting execution, nor is it supported by an examination of the entire legislative scheme pertaining to related questons of "insanity" such as to warrant a verdict of not guilty, and "insanity" such as to preclude trial.

It also is claimed on behalf of Keaton that the Common Pleas Court, after first suspending the date of execution then scheduled for November 8, 1968, in order to allow time for such proceedings, had no power, after finding Keaton not to be insane, to then set a new date of execution. We conclude that this assertion is answered by the holding in *Schaber* v. *Maxwell* (1964), 176 Ohio St. 58, that, where a stay of execution is granted by a court, "it is within the

inherent power of the court to terminate such stay of execution and to set a date when the sentence shall be carried into execution."

For the reasons set forth herein, both under parts I and II of this decision, this appeal is ordered dismissed.

*Appeal dismissed.*

DUFFY, P. J., and STRAUSBAUGH, J., concur.