Anthony Wayne CARCHEDI, Plaintiff,

v.

James A. RHODES, et al., Defendants.

No. C–2–80–1081.

United States District Court,
S.D. Ohio, E.D.

April 7, 1982.

---

Bruce A. Campbell, Columbus, Ohio, for plaintiff.

Dennis L. Sipe, Asst. Atty. Gen. of Ohio, Columbus, Ohio, for defendants.

## OPINION AND ORDER

DUNCAN, District Judge.

Plaintiff, a former inmate of an Ohio penal institution, brings this action against the state and various officers thereof to annul a condition of his parole which effectively precludes him from returning to Ohio for approximately 40 years. He argues that such a restriction amounts to banishment, thereby violating his rights under both the federal and state constitutions. The state contends that no constitutional violation has occurred and that in any event plaintiff has waived any rights which may be implicated by the condition.

The parties have entered into a stipulation regarding the pertinent facts and have agreed to submit the case on cross-motions for summary judgment. In addition, a brief evidentiary hearing was held on the narrow issue of waiver. There being no additional issues of material fact still outstanding, the case is now ripe for a decision on the merits. The Court's findings and conclusions follow.

I

Plaintiff Carchedi was convicted in 1971 by a state court on two counts of armed robbery and one count of unlawful operation of a motor vehicle; he was sentenced to a term of 20 to 50 years imprisonment. Later that year he applied to the governor for clemency. The Ohio Adult Parole Board, to which such requests are usually referred, recommended in 1972 that Carchedi's application be turned down. In 1973, the governor, acting upon the recommendation, denied Carchedi's request.

Five and a half years later, Carchedi's case was reviewed again. The Parole Board again advised against a pardon, but recommended instead in 1979 that his sentence be commuted to a term of 12 to 50 years, thereby making him eligible for parole consideration.

Prior to any formal action on this recommendation, Carchedi wrote two letters to Steven A. Hatten, the deputy assistant to the governor in charge of reviewing commutation recommendations. The first letter, dated March 30, 1980, simply inquired as to why no action had yet been taken on the Parole Board's recommendation. The second, dated April 1, 1980, indicated that Carchedi would leave the state immediately upon being granted release. Carchedi pointed out in the letter that his case had

received some attention from the news media, and he wrote further that:

I have no family here in the [S]tate of Ohio, therefore, if, and when I do get my freedom I would be leaving this state. The only relatives that I have live in Southern Indiana, and a few in Massachusetts. The subject that I for got [sic] to mention in the five page letter to you, Mr. Hatten, was, [i]f an[d] when I get my freedom I could be long gone before the suns [sic] rays hit the tops of the trees. Clear out of this state, to disappear before any news media knew I was gone. My freedom is more important to me than being on television, and if given the opportunity, I could show you just how fast I could, and would, leave the [S]tate of Ohio, for good.

On May 29, 1980, the governor, defendant Rhodes, issued a provisional warrant commuting Carchedi's sentence as recommended, on the condition that Carchedi not return to Ohio until the maximum term of his sentence had run unless he was granted permission by the Parole Board. Carchedi indicated his acceptance of the special condition by executing and signing a certificate appended to the commutation order. As a result of the commutation agreement, Carchedi became eligible for parole several months earlier than he would have been otherwise.[1]

On July 11, 1980, the Parole Board notified Carchedi by letter that he had been granted a parole. The letter noted a special condition that Carchedi was not to return to the state without the express authorization of the Ohio Adult Parole Authority. Four days later, Carchedi signed a form parole agreement which listed the usual parole conditions but apparently did not on its face indicate any special restrictions. Prior to being released, however, Carchedi was issued a parole certificate which did include notification of the "no return" condition.

Pursuant to R.C. 5149.17, *et seq.,* the Ohio parole authorities contacted their Indiana counterparts and arranged for Carchedi to report to a senior parole officer in Evansville, Indiana. It is unclear from the record whether the Indiana parole authorities were aware of the special condition attached to Carchedi's commutation and parole, but it is relatively clear that they agreed to supervise him and that they were aware of his plan to move to the Evansville area where he had lived prior to his conviction in Ohio.

On July 30, 1980, Carchedi was released from custody. He left the state immediately and took up residence in Indiana in accordance with the terms of the parole.

Approximately eight weeks later, Carchedi applied to the Ohio Parole Board for permission to re-enter the state in order to visit his fiancée for the upcoming Thanksgiving and Christmas holidays. On October 3, 1980, permission was denied by defendant Shoemaker, the Chief of the Adult Parole Authority. Shoemaker wrote:

It is far too early in your parole period to consider granting permission to return to Ohio. We will want to evaluate your adjustment to your present circumstances over a substantial period of time.

Carchedi filed the present complaint in this Court on December 22, 1980. In it he claims a desire to return to Ohio "to complete his college education, to associate with friends and loved ones, to assume a useful place in society, and to transact his lawful business." In addition to nullification of the special condition, Carchedi seeks injunctive relief as well as compensatory and punitive damages.

## II

Carchedi's numerous objections to the terms of his commutation and parole follow

---

1. Assuming that the governor would not have been willing to commute Carchedi's sentence without the special proviso, it appears that Carchedi received parole at least nine months before he otherwise would have in return for his promise to leave the state. Carchedi testified that his application would not have been

eligible for a re-hearing by the Parole Board until nearly nine months after the conditional parole was granted. It is unclear from the record whether he could have obtained a parole even then had the governor continued to refuse commutation.

two basic themes. He argues first that the governor's action was outside the permissible scope of executive authority under both the state and federal constitutions. He contends next that the special conditions abridge certain of his individual rights, including the right of association, the rights of due process, the right to be free of cruel and unusual punishment, and the right to travel. The Court finds these arguments unavailing.

### A

In contending that the special clause of his commutation and parole constitutes an improper exercise of the governor's clemency powers, Carchedi relies primarily on Article I, Section 12 of the Ohio Constitution, which provides in pertinent part that:

No person shall be transported out of the state, for any offense committed within the same.

This provision prohibits the state legislature from allowing criminals in Ohio to be banished from the state as punishment for their crime. Carchedi asserts that the clause also precludes the governor from attaching a "no return" condition to the commutation of a criminal sentence and subsequent grant of parole.

The Supreme Court of Ohio has yet to address this precise issue, and apparently only one Ohio court has ever been faced with it. Long ago, in *Ex Parte Lockhart*, 1 Disn. 105, 12 Ohio Dec. Reprint 515 (Super. Ct.1855), a state trial court turned down a challenge to the governor's powers on facts remarkably similar to those at hand. There the complainant had received from the governor a pardon which was contingent upon the prisoner's agreement not to return to the state for five years. Later the prisoner was apprehended within the state borders and was placed in custody. He petitioned for release on grounds that the conditional pardon had been *ultra vires* from its inception. The court rejected this argument, reading Article I, Section 12 narrowly. Citing the broad powers traditionally conferred upon the state and federal executives, it reasoned that the provision was

aimed primarily at the legislature, and that it applied only to the establishment of statutory punishments for particular crimes, not to a condition of commutation ordered by the governor and voluntarily entered into by the prisoner. The authority of the governor to impose the special condition was thus upheld.

Given the vast age of this decision, as well as the fact that it was not rendered by the highest court of the state, this Court is probably not bound by its teachings. Nonetheless, after reviewing the pleadings of the parties and subsequent developments in the law of executive authority, the Court finds the reasoning of *Lockhart* to be persuasive.

In contrast to Article I of the state constitution, which addresses individual rights, Article III concerns itself with the duties and powers of the executive. Section 11 of this article provides that the governor:

shall have power, after conviction, to grant reprieves, commutations, and pardons, for all crimes and offenses, except treason and cases of impeachment, upon such conditions as he may think proper.

This language on its face is quite broad, and the courts of Ohio have construed it liberally. *See, e.g., Knapp v. Thomas*, 39 Ohio St. 377 (1883); *State, ex rel. Gordon v. Zangerle*, 136 Ohio St. 371, 26 N.E.2d 190 (1940); *In re Keaton*, 19 Ohio App. 254, 250 N.E.2d 901 (Franklin Cty. Ct.App.1969). A condition of commutation decreed by the governor will ordinarily not be invalidated by the state courts unless it is found to be illegal, impossible of performance, or contrary to public policy. *Knapp v. Thomas*, 39 Ohio St. at 392; *Huff v. Dyer*, 4 Ohio Cir.Ct.Rep. 595, 597, 2 Ohio Cir.Dec. 727 (Franklin Cty.Ct.App.1890); *see also*, 41 Ohio Jur.2d, Pardon, Parole and Reprieve §§ 16, 18 (1960) (and cases cited therein). In fact, the Court has been unable to find any reported case in which an Ohio court has overturned a special commutation condition ordered by the governor.

This deference to the executive in matters of commutation and parole appears to be consistent with the approach taken by

federal courts in cases challenging the powers of the President to grant conditional pardons or reprieves. In *Schick v. Reed,* 419 U.S. 256, 95 S.Ct. 379, 42 L.Ed.2d 430 (1974), for example, the Supreme Court was asked to decide whether the President could constitutionally commute a death sentence to life imprisonment on the condition that the prisoner never become eligible for parole. The Court thoroughly reviewed the history of the executive clemency powers, including the common law powers held by the British monarch prior to enactment of the United States Constitution. It observed that the throne traditionally had the power to pardon criminals on the condition that they be transported to another place, notwithstanding the fact that banishment was generally frowned upon as punishment for a crime. After examining the legislative history behind the Reprieves and Pardons Clause of the federal constitution, the Court stated:

> We see, therefore, that the draftsmen of Art. II, § 2 spoke in terms of a "preogative" of the President, which ought not be "fettered or embarrassed." In light of the English common law from which such language was drawn, the conclusion is inescapable that the pardoning power was intended to include the power to commute sentences on conditions which do not in themselves offend the Constitution, but which are not specifically provided for by statute.

419 U.S. at 263–264, 95 S.Ct. at 383–84. Under *Schick,* then, the President's discretion in such matters is almost absolute, subject only to the limitations posed by public policy and the Constitution itself. *Accord, Hoffa v. Saxbe,* 378 F.Supp. 1221 (D.D.C. 1974) (upholding presidential pardon conditioned upon prisoner not returning to leadership in organized labor movement).

The powers held by the federal executive are not dispositive of the scope of authority inhering in a state governor, of course, but in this particular context the parallels between the state and federal constitutions are both striking and immediately apparent. The language of the reprieves and pardons clauses of both documents are markedly similar, save that Article II, Section 2 of the federal constitution does not expressly bestow upon the President the right to grant provisional clemency. If anything, the language of the United States Constitution would seem more restrictive than that of Ohio. The analogy between the powers of the President and the powers of the Governor of Ohio would thus appear to be appropriate under the circumstances. *Accord, Knapp v. Thomas; State, ex rel. Gordon v. Zangerle, supra.*

■ On the basis of these authorities, both state and federal, the Court finds inescapable the conclusion that the Governor of Ohio has full authority to impose one or more conditions upon the grant of executive clemency, provided that no such condition is impossible to perform, contrary to established public policy, or repugnant to either the state or federal constitutions. The Court must now turn to whether the conditions agreed to by Carchedi exceeded any of these three limitations.

■ Certainly it is not impossible for Carchedi to refrain from returning to Ohio without obtaining permission from the state parole authorities. Even assuming that the Parole Board would never allow Carchedi to re-enter the state,[2] the restriction cannot be said to work an unreasonable hardship upon him. According to the evidence available to the Court, Carchedi was never even a resident of Ohio. At the time he committed the armed robbery, he was apparently in Ohio for the sole purpose of perpetrating the crime. He claims to have some acquaintances and a girlfriend within the state, but these contacts appear to have arisen after his conviction and incarceration. Carchedi was raised in Indiana, and

---

2. This assumption may not be entirely valid. The Parole Board would seem to be well within its authority in refusing ever to let Carchedi back into the state, but the language defendant Shoemaker's letter to Carchedi, quoted *supra,* suggests that the Board would at least be willing to consider giving its consent once it was convinced that Carchedi has adjusted well to his parole.

he apparently has no relatives in Ohio, so he is not being cut off from his family. The Court realizes that there is a certain intrinsic value to being in the State of Ohio, and it acknowledges the inconvenience which may stem from having to arrange visits outside of the state or having to forego the most direct route when traveling between states, but it feels nevertheless that the restriction imposed by the governor amounts to something far less than an impossible burden.

Likewise the special condition is not contrary to public policy. Carchedi points out correctly that under some circumstances a "no return" proviso would run counter to the notion that states should refrain from "dumping" their criminals on one another. *See Rutherford v. Blankenship,* 468 F.Supp. 1357 (W.D.Va.1979). This policy is largely inapposite here, though, because under Ohio statutory law, the state cannot parole its prisoners to another state without first obtaining the consent of the receiving state pursuant to an interstate compact for the mutual exchange of parolees. R.C. 5149.17; *see also,* 4 U.S.C. § 112. Ohio has such a compact with Indiana, and the evidence shows that Indiana agreed to receive Carchedi. *See* Joint Exhibit VIII. Presumably, then, Indiana could have declined to accept Carchedi, and it can at any time threaten to withdraw from the compact if it appears that Ohio is attempting to dump its criminals there. Carchedi's dumping argument is thus without substance, and the Court can discern no other nonconstitutional public policy militating against enforcement of the special provision of Carchedi's release.

The power of the governor to negotiate a "no return" agreement in this case must therefore turn on whether the condition imposed is somehow repugnant to one or more of the individual rights guaranteed by the Constitution. Carchedi has, in the second branch of his argument, claimed that a number of these rights are indeed trammeled by the special restriction. To these claims the Court must now proceed.

**B**

██ A convicted criminal has no inherent constitutional right to be conditionally released before the expiration of a validly imposed sentence. *Greenholz v. Nebraska Penal Inmates,* 442 U.S. 1, 7, 99 S.Ct. 2100, 2104, 60 L.Ed.2d 668 (1979). Once released on parole, a convict may not be entitled to the full range of rights accorded other citizens, and the government may impose upon the parolee certain conditions of liberty which would be unconstitutional if applied to ordinary individuals. *See Morrissey v. Brewer,* 408 U.S. 471, 478, 92 S.Ct. 2593, 2598, 33 L.Ed.2d 484 (1972). This does not mean that parolees are wholly without constitutional protection, however. In granting a parole, the government seeks both to help rehabilitate a former prisoner and to protect society from any recidivist tendencies that the individual may have. It follows that a parolee may raise constitutional objections to conditions of parole which are not reasonably and necessarily related to these two government interests. *See Birzon v. King,* 469 F.2d 1241, 1243 (2d Cir. 1972).

The Court has little doubt that the "no return" clause of Carchedi's commutation and parole implicates several important constitutional rights. The condition arguably infringes upon Carchedi's right as a citizen to travel freely from state to state. *Shapiro v. Thompson,* 394 U.S. 618, 629–631, 89 S.Ct. 1322, 1328–29, 22 L.Ed.2d 600 (1969); *United States v. Guest,* 383 U.S. 745, 757–60, 86 S.Ct. 1170, 1177–79, 16 L.Ed.2d 239 (1966). It also restricts his freedom to associate with friends and loved ones who may reside in Ohio. *Eisenstadt v. Baird,* 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972); *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 137 (1974). Finally, it bears some resemblance to "banishment," which has under some circumstances been viewed as cruel and unusual punishment. *Dear Wing Jung v. United States,* 312 F.2d 73 (9th Cir.1962); *Rutherford v. Blankenship,* 468 F.Supp. 1357 (W.D. Va.1979); *State v. Kasnett,* 30 Ohio App.2d 77, 283 N.E.2d 636 (Ct.App.1972). The

Court has serious reservations, moreover, as to whether these intrusions into Carchedi's rights are truly necessary and proper to further the state's legitimate interests in supervising its released felons. It must therefore assume, without deciding, that Carchedi's constitutional objections have at least some merit.

The state contends nonetheless that Carchedi waived his rights by signing the commutation and parole agreements, and that he is thereby estopped from raising any possible constitutional infirmities with respect to the conditions contained therein. It points out that Carchedi actually initiated the conditional release by writing to the governor, making Carchedi in effect the author of the agreement to which he now objects. Carchedi counters by arguing that the stress of incarceration rendered him incapable of making a valid waiver of his constitutional rights. At issue is whether the doctrine of waiver can ever be applied to former prisoners who seek to challenge the negotiated conditions of their parole, and, if so, whether the doctrine should apply on these facts.

The Court is not aware of a case in which the first issue has been squarely decided,[3] but it is convinced nonetheless that a prospective parolee may, under certain narrow circumstances, waive the right to object to an arguably unconstitutional condition of his or her commutation and parole. Undoubtedly the prospect of further confinement exerts considerable pressure on a prospective parolee to agree to terms which might otherwise be unacceptable, but the same kind of pressure is also present in a number of governmental bargaining situations whose validity has long been recognized by the courts.

In deciding to accept the terms of a commutation and parole, a prisoner is forced to choose between the prospect of continued incarceration and the prospect of an agreement which may somehow restrict his or her constitutional rights. The government, in effect, is offering to allow the prisoner to regain his or her freedom in return for a promise to abide by rules which, to a greater or lesser extent, limit the exercise of fundamental rights. In this respect the transaction is no different from other agreements in which the government conditions its grant of a substantial benefit on the relinquishment of a known constitutional right. The government may, for example, compel a criminal defendant to give up the right to a jury trial or the right not to make self-incriminating statements in return for allowing a guilty plea to lesser charges. *Brady v. United States,* 397 U.S. 742, 751–753, 90 S.Ct. 1463, 1470–71, 25 L.Ed.2d 747 (1970); *see also Bordenkircher v. Hayes,* 434 U.S. 357, 363, 98 S.Ct. 663, 667, 54 L.Ed.2d 604 (1978). It may also condition the transfer of a United States citizen from a foreign prison to a federal prison upon the prisoner's relinquishment of the right collaterally to attack the foreign conviction. *Pfeifer v. United States Bureau of Prisons,* 615 F.2d 873 (9th Cir.1980); *Rosado v. Civiletti,* 621 F.2d 1179 (2d Cir. 1980); *Kansola v. Civiletti,* 630 F.2d 472 (6th Cir.1980). In these situations, if the individual who received the benefit later challenges the terms of the bargain, and if all other prerequisites of waiver have been met, he or she is deemed to have waived the right given up.[4] The Court sees no reason

---

**3.** In *Rutherford v. Blankenship,* 468 F.Supp. 1357 (W.D.Va.1979), the court struck down a portion of a plea agreement which required the petitioner to leave the State of Virginia. The court found that the agreement was validly entered into but did not reach the issue of whether an individual could waive the rights implicated by a "no return" condition, since it found that the agreement on its face violated public policy.

**4.** The Court recognizes that in some situations an individual cannot be said to have made a truly voluntary and intelligent choice in his bargaining with the state unless the individual's attorney or a judge has, prior to acceptance of the agreement, had the opportunity to inquire into its factual basis and advise the individual accordingly. *See, e.g., North Carolina v. Alford,* 400 U.S. 25, 38 n. 10, 91 S.Ct. 160, 167 n. 10, 27 L.Ed.2d 162 (1970) (guilty pleas). Such an inquiry is not necessary in the context of commutation and parole agreements, however, for the choices are relatively clear-cut and the potential parolee is perfectly capable of making an intelligent decision without judicial

why this should not be equally true where a parolee receives a reduction of jail time in exchange for the limited relinquishment of certain known constitutional prerogatives.

The Court also believes that a valid waiver took place here. Waiver, of course, cannot be lightly inferred, especially where important rights are at stake. "Waivers of constitutional rights not only must be voluntary, but must be knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences." *Brady,* 397 U.S. at 748, 90 S.Ct. at 1468. The Court must scrutinize carefully the facts and circumstances surrounding the supposed waiver, indulging in every reasonable presumption against its validity. *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938). This is no less true where the rights allegedly lost were bartered away as part of a deal with the state. The Court cannot approve such an agreement unless it is convinced that the bargain was struck intelligently and voluntarily by the party whose rights are subject to forfeit. *See Brady, supra.*

■ The Court finds, though, that these prerequisites have been met in the instant case. The agreement certainly was voluntary in the sense that it was initiated solely by the parolee himself. Carchedi testified at the evidentiary hearing that the idea of a "no return" parole agreement came to him after he learned of a similar case in Georgia. (Tr. 13). He first suggested the possibility of a conditional parole to the governor in his letter of April 1, 1980, and the governor accepted his proposition without significant alteration. There is absolutely nothing on the record to indicate that the proposed condition originated with any government agent or official. Carchedi can truly be viewed as the lone architect of his commutation and parole compacts.

Carchedi had many opportunities to withdraw from the agreement as well. The commutation did not come down until nearly two months after he had written the

governor, and he could easily have declined to ratify the special condition attached thereto by refusing to sign the commutation order. He was informed by a government official that he had the right of refusal and he admitted at the hearing that refusal actually crossed his mind (Tr. 28), but he signed the document anyway after reading it and taking a few minutes to think about it. (Tr. 17–18). He could also have backed out of the arrangement the next month when he was asked to sign the parole agreement. As noted above, that form did not specifically enumerate the special condition, but the Parole Board had notified Carchedi both by letter and in person at a hearing that it was part of the bargain. (Tr. 27). He did not sign this latter document immediately; rather he waited until he had had the chance to reflect upon its implications. (Tr. 26–27). From these facts the Court must infer that Carchedi entered into the bargain voluntarily, with full knowledge of his option to reject the special condition at any time prior to being released.

Nor was Carchedi in any way forced to accept the condition. Aside from the inherent pressure posed by the possibility of further confinement, Carchedi was exposed to no undue coercion by the state. The governor did not threaten, explicitly or impliedly, to retaliate against Carchedi if he failed to sign the commutation certificate, and there is nothing on the record to suggest that any government official ever counseled, much less pressured, Carchedi into accepting the conditional commutation and parole. Indeed, the state agent who presented the commutation document to Carchedi for signing was, by Carchedi's own admission, totally non-committal in response to Carchedi's remark that he might not sign it. (Tr. 60). The Court therefore has no choice but to conclude that the alleged waiver of rights was sufficiently voluntary to pass constitutional muster.

supervision or constant access to counsel. *Accord, Rosado v. Civiletti,* 621 F.2d 1179, 1192 n.

33 (2d Cir.1980) (per Kaufman, J.)

The Court believes further that Carchedi's acceptance of the unusual terms of his release was "knowing and intelligent," within the meaning of *Brady* and its progeny. He may not have been aware of each and every constitutional clause implicated by the special terms of the bargain, but he was sufficiently cognizant of the likely consequences of agreeing to it. He testified at several points in the evidentiary hearing that in signing both the commutation and parole papers, he was fully aware that he could not return to Ohio for the maximum potential duration of his sentence without first obtaining permission from the parole board. (Tr. 16, 26–27). In other words, he realized that he might be precluded from traveling into or through the state for approximately 40 years.[5]

There was apparently some confusion in Carchedi's mind regarding the Parole Board's 1979 recommendation to the governor. Carchedi testified that he was surprised when the commutation order did not simply reduce his sentence to time served, since he thought that that was what the Parole Board had recommended. Had that been the case, Carchedi would presumably not have had to serve any parole time whatsoever. This misconception on his part, however, appears to have played no material role in his decision to sign the commutation papers. According to his testimony, he fully understood the effect of the commutation even though its terms were not exactly what he expected, and he signed the document nevertheless. (Tr. 16–17).

His choice seems to have been an intelligent one. If he had not signed the conditional commutation order, it appears likely that he would not have been released for at least nine months. In essence he received nine months of freedom in exchange for the promise not to return to Ohio—a promise which in Carchedi's case created only a relatively slight burden. In light of his avowed distaste for life in prison, the bargain seems consistent with Carchedi's own best interests.

Based largely on its observations of Carchedi's demeanor and intelligence, the Court feels that Carchedi knew all along precisely what he was about. While in prison, he shrewdly caught the attention of local news media, thereby bringing indirect pressure on the governor to grant his release. After being released, he made statements to the press suggesting that he procured his conditional commutation and parole fully expecting that he could have the special conditions declared unconstitutional at a later date. *See* Defendants' Exhibit A. These observations, while certainly not dispositive of the case, add strength to the conclusion that Carchedi agreed to the terms of his commutation and parole intelligently and with full appreciation of the risks and ramifications therein.

Both prongs of the *Brady* test having been satisfied, the Court finds that Carchedi validly waived any rights he may have had to challenge the constitutionality of his conditional commutation and parole. The second branch of his argument is thus without merit. It is also clear that the first branch of Carchedi's legal attack is equally fruitless. The governor may not attach upon commutation and parole agreements any condition which offends the rights guaranteed by the Constitution, but such rights are not offended when they have been validly waived as part of a legitimate bargain between the state and an individual.

Accordingly the Court must hold Carchedi to the terms of his bargain. As the Supreme Court noted in *Schick v. Reed, supra:*

> It would be a curious logic to allow a convicted person who petitions for mercy

---

5. Carchedi testified that he did not think the Parole Board would actually refuse his requests to enter the state once he was out on parole. Given the circumstances under which he procured the commutation and parole, as well as Carchedi's combined experience with penal authorities, the Court finds this testimony to be unworthy of belief. Even if Carchedi did actually believe that the state would gladly welcome him back within weeks of his release, the Court feels that this belief was wholly unreasonable in light of the surrounding circumstances and Carchedi's apparently keen intelligence.

to retain the full benefit of a lesser punishment with conditions, yet escape burdens readily assumed in the commutation which he sought.

419 U.S. at 267, 95 S.Ct. at 385. Like the petitioner in *Schick,* Carchedi seeks here to reap the benefits of his bargain without suffering its attendant obligations. Even if it were to find some constitutional defect in the bargain, the Court could not in all fairness grant the relief Carchedi seeks. For this additional reason, the suit must fail.

### III

The Court should note in conclusion that its holding with respect to this matter is quite narrow. The Court does not endorse the general use of "no return" conditions in commutations and paroles, nor does it take a position on whether such restrictions are valid when initiated by the governor or some other government official. Similarly, the Court is not called upon to decide whether such a provision would be valid where the petitioner was forced to leave the original state of his residence, or where the release was undertaken as part of a wholesale attempt to export dangerous criminals. The Court holds simply that, under these very peculiar circumstances, a special condition of commutation and parole which prevents the parolee from returning without permission to the state of his incarceration is constitutionally valid.

Accordingly, petitioner Carchedi's motion for summary judgment is DENIED. Defendants' corresponding motion is GRANTED. The case is hereby DISMISSED, and JUDGMENT shall be entered in favor of defendants forthwith.

So ORDERED.